**FILED**

**FEBRUARY 8, 2008**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PMG DATA SERVICES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 08 CV _____ |
| | ) | |
| ROBERT J. McNALLY and | ) | |
| HALLMARK DATA SYSTEMS LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**08 C 854**

**JUDGE NORGLE
MAGISTRATE JUDGE ASHMAN**

## COMPLAINT

NOW COMES plaintiff, PMG Data Services, Inc., by its undersigned attorneys, and as its

Complaint against Robert J. McNally and Hallmark Data Systems LLC, states as follows:

### Parties

1.     PMG Data Services, Inc. ("PMG") is a Minnesota corporation with its principal

place of business located in Mendota Heights, Minnesota.

2.     Robert J. McNally ("McNally") is an individual who resides in Niles, Illinois.

3.     Hallmark Data Systems LLC ("Hallmark") is a Delaware limited liability

company with its principal place of business located in Skokie, Illinois.

### Jurisdiction and Venue

4.     Jurisdiction is proper pursuant to 28 U.S.C §1332 because complete diversity of

citizenship exists and the amount in controversy exceeds $75,000.

5.     PMG is a citizen of Minnesota.  McNally is a citizen of Illinois.  Hallmark is a

citizen of Illinois, Delaware and New York.  The members of Hallmark are one or more of the

following persons and/or entities: James Kuchinski; Raymond Miller; Tinicum Investors LP;

and/or Tinicum Capital Partners LP.  Tinicum Investors LP and Tinicum Capital Partners LP are

1

6281585v1 884549

each Delaware limited partnerships and each has its principal places of business located in New

York.  The partners of Tinicum Investors LP and of Tinicum Capital Partners LP are one or more

of the following persons and/or entities: Eric M. Ruttenberg; Derald H. Ruttenberg; John C.

Ruttenberg; Katherine T. Ruttenberg; Hattie Ruttenberg; RUTCO Inc.; Tinicum Associates, Inc.;

Tinicum Enterprise, Inc.; Tinicum Foreign Investments Corporation;  Robert J. Kelly; Seth M.

Hendon; John F. Keane and/or Edward Civello.  Kuchinski and Miller are citizens of the State of

Illinois.  Eric M. Ruttenberg, Derald H. Ruttenberg, John C. Ruttenberg, Katherine T.

Ruttenberg, Hattie Ruttenberg, Robert J. Kelly, Seth M. Hendon, John F. Keane and Edward

Civello are citizens of the State of New York.  RUTCO Inc.; Tinicum Associates, Inc.; Tinicum

Foreign Investments Corporation; and Tinicum Enterprise, Inc. are Delaware corporations with

their respective principal places of business located in New York.  Upon information and belief,

none of the individual members of Hallmark or the individuals comprising any member-entities

are citizens of the State of Minnesota.

6.      Venue is proper pursuant to 28 U.S.C. § 1391(a) because the defendants reside in

this District and because a substantial part of the events giving rise to the claims asserted herein

occurred in this District.

### Allegations Common to All Counts

7.      PMG is engaged in the business of providing subscription fulfillment and

circulation management services to business to business publishers of magazines and other print

publications.  PMG has facilities located in Mendota Heights, Minnesota and Chicago, Illinois.

8.      Hallmark is also in the business of providing subscription fulfillment services and

is a direct competitor of PMG.  PMG's share of the fulfillment market is less than one percent,

while Hallmark is the dominant player in the fulfillment market.

9.      PMG employed McNally as a General Manager for approximately five years,

from January 2003 until the scheme described below was discovered and he was terminated on December 17, 2007. McNally was PMG's single highest paid employee. He had exclusive management responsibility for the Illinois facility and was integrally involved in both the subscription fulfillment and circulation management aspects of PMG's business. McNally had broad discretion in the performance of his duties and performed the circulation management function of PMG's business with a significant degree of autonomy. McNally was also privy to all of PMG's confidential and proprietary information, including, but not limited to, its client lists, client contact information, proposals, pricing structures, and profit margins.

10.     Glen Giles ("Giles") is the Director of New Business Development for Hallmark. The acts and omissions of Giles described herein were undertaken by him as an employee and agent of Hallmark and with Hallmark's actual and/or constructive knowledge and actual, constructive, and/or apparent authority. In addition, Hallmark later ratified the acts of Giles described herein.

11.     At all times referenced herein, Hallmark and Giles had actual knowledge that McNally was employed by PMG and that PMG was in the business of providing circulation management and fulfillment services in connection with print publications.

12.     Since at least January of 2006, McNally has been working as an agent of Hallmark with actual authority to engage in the acts described herein. In addition, Hallmark later ratified the acts of McNally described herein.

13.     With the encouragement and assistance of Giles and Hallmark, almost two years before PMG discovered their scheme, McNally was directly competing with PMG and diverting business opportunities to himself and Hallmark.

14.     While employed by PMG, McNally diverted several opportunities for circulation management services to himself and several opportunities for fulfillment services to Hallmark.

3

In exchange for the diversion of fulfillment work, Hallmark fed McNally circulation

management work which McNally kept for himself and did not disclose to PMG.

15.     While McNally was employed by PMG, McNally and Hallmark caused one of

PMG's biggest clients, Hendon Publishing Company, to terminate its contract with PMG and to

enter into a contract with McNally personally for circulation management work and with

Hallmark for fulfillment services work.  PMG had been providing both of those services to

Hendon and Hendon's business accounted for almost twenty percent (20%) of PMG's revenues.

16.     McNally used PMG's own resources to compete with PMG.  McNally and Giles

regularly communicated through McNally's PMG email account about the diversion of PMG's

business opportunities and documents the defendants used to compete with PMG were found on

the hard drive of the computer McNally used at PMG, including proposals submitted to some of

the diverted business opportunities.

17.     In an email dated January 3, 2006 from McNally to Marty McLellan of Newport

Communications, the publisher of Heavy Duty Trucking Magazine ("HDT"), McNally stated

that he had spoken to Giles of Hallmark regarding HDT's contract with its current vendor.

McNally proceeded to tell McLellan how to set that vendor up for a breach of contract.

In a later email from McNally to McLellan, September 25, 2006, McNally confirmed that he

would personally provide circulation management services to HDT and that Hallmark would

provide the subscription fulfillment services to HDT.

18.     A series of emails dated September 7, 2006 reflect that Giles and Hallmark had

referred a potential circulation management client, AVN, to McNally.  In exchange, McNally

tried to induce AVN to give its fulfillment work to Hallmark, telling AVN that Hallmark is

"competent and easy to work with."

19.     McNally and Hallmark solicited the Metal Services Center Institute ("MSCI") for

4

its circulation management and fulfillment work. In an email dated June 29, 2007 from McNally to a representative of MSCI, McNally thanks the contact for meeting with him the day before and proposes that McNally perform their circulation management work and Hallmark provide the fulfillment services to MSCI.

20.     In an email from McNally to Giles dated July 27, 2007, McNally expresses his disappointment that he was not initially able to persuade MSCI to give him its circulation management work and Hallmark its fulfillment work. McNally asked Giles for advice on where he had gone wrong in his proposal to MSCI. Giles later replied to that email instructing McNally of what to do to try to salvage this business opportunity for McNally and Hallmark. McNally exclaimed in the July 27, 2007 email:

> "I feel more trapped In this fucking dump today than I did yesterday or this morning for that matter. . . . One bit of weirdness from the meeting [with MSCI]. I presented it as I would do the work, not PMG, after at one point Chris said we are hiring you to do circulation or fulfillment or both and I replied it depends on what exactly you need."

21.     In a July 11, 2007 email, McNally stated that he had received a lead from Giles for some circulation management work for "a newsstand guy" and that McNally had contacted this prospect to discuss McNally handling his circulation management work.

22.     In an exchange of emails between Giles and McNally on August 13, 2007, McNally advises Giles of a potential business opportunity and again expresses his ill will towards PMG: "And you wonder why I hate everybody that had ever been connected with this fucking place." Giles replied by lauding McNally's efforts and stated: "you may have a business of your own if we keep this up." (underlining added). Indeed, with the assistance and encouragement of Hallmark and while still employed by PMG, McNally had long since begun a "business of his own" by diverting circulation management work to his own use and fulfillment

5

work to Hallmark.

23.    Also on August 13, 2007, McNally responded to a request by Giles that McNally send him one of PMG's written proposals that fit certain criteria defined by Giles. McNally in fact sent one of PMG's written proposals to Giles. Among other things, that proposal contained PMG's pricing. McNally told Giles that this PMG proposal was "the closest to what you were looking for, for purposes of comparison, Multi titles, not 140K but in the neighborhood." Upon information and belief, McNally and Hallmark used this PMG proposal to prepare a successful proposal to one of PMG's biggest clients, Hendon Publishing Company.

24.    On September 3, 2007, McNally submitted a proposal to Linux Journal in an effort to obtain circulation management work for himself and fulfillment work for Hallmark.

25.    In a September 7, 2007 email, Dan Johnson-Weinberger of Permanent Campaigns Consulting emailed McNally stating that he had been referred to McNally as a potential vendor for circulation management services for a magazine called More Riders Magazine. McNally replied to that email on September 11, 2007, stating that his rate for circulation management services was $100 per hour and that "if we were to do fulfillment as well it would be based on both the size of the file and an estimate of the hours spent." McNally's reference to "we" was a reference to McNally and Hallmark.

26.    In the Summer and Fall of 2007, McNally and Hallmark solicited a publisher of various magazines, Key Communications, for McNally to provide circulation management services and Hallmark to provide fulfillment services. McNally and Hallmark later submitted a written proposal and sample budget to provide those services to Key Communication. On or about September 5, 2007, McNally traveled to Virginia and met with representatives of Key Communications. On September 10, 2007, McNally and Hallmark submitted another written proposal to Key Communications to provide these services. A representative of Key

6

Communications asked McNally to confirm that he was able to "subcontract the fulfillment work," and McNally confirmed that he could do that and could personally coordinate the fulfillment services. Upon information and belief, McNally is providing or has provided circulation management services to Key Communications and Hallmark has provided and is providing fulfillment services to Key Communications.

27.     In an email dated December 5, 2007, Gail Weaverling of Stackpole Magazines told McNally that she had been referred to McNally as a possible vendor of fulfillment services. Upon information and belief, McNally offered this fulfillment opportunity to Hallmark, but Hallmark was not interested in it. McNally asked Giles in an email if there was any reason McNally should give this opportunity to PMG. Giles stated that it was "probably" a better idea to refer the opportunity to a company called ESP Computer Services Inc. ("ESP") in order to "curry favor" with ESP. McNally in fact referred that opportunity to ESP and in an email to Stefan Beeli of ESP, McNally stated that he was referring this work to Beeli "discreetly." Beeli replied that he would keep the diverted opportunity "in confidence."

28.     On December 5, 2007, McNally signed a contract with ALM Business Media ("ALM"), publisher of On-the-Go FoodService's print publication, to provide it with circulation management services. In a December 12, 2007 email, Giles of Hallmark told Tricia Speer of Hallmark, that Hallmark would have a signed contract with ALM the following day and that McNally would be doing the circulation management work for ALM.

29.     In the same December 5, 2007 email referenced above, in response to McNally's question to Giles regarding whether Hallmark had signed the contracts with Key Communications and On-the-Go FoodService, Giles told McNally: "Key – no. Let's discuss. I thought I was going to negotiate that with you, Maureen – Final contract was sent out today."

30.     Also in November and December of 2007, as alluded to above, McNally and

7

Hallmark induced one of PMG's biggest clients, Herndon Publishing Company, to move its circulation management work from PMG to McNally and to move its fulfillment work from PMG to Hallmark.

31.    In a December 12, 2007 email, Giles tacitly acknowledged the impropriety of the conspiracy between McNally and Hallmark, asking McNally: "Why do you keep using this e-mail account?"

32.    PMG was capable of performing the circulation management and fulfillment work with respect to each of the corporate opportunities described above, as those are precisely the services PMG is in the business of providing. However, McNally did not present any of those opportunities to PMG or disclose their existence to PMG. McNally further failed to disclose that he was personally performing circulation management work, referring fulfillment work to Hallmark, or that he had entered into an agreement with Hallmark pursuant to which Hallmark would refer circulation management work to McNally personally in exchange for McNally diverting fulfillment work to Hallmark,

33.    McNally and Hallmark proximately caused PMG to sustain damages, including but not limited to, lost profits from the diverted business opportunities, lost profits from the loss of existing business, and the payment of over $150,000 in salary to McNally for a period of time during which he was unfairly and wrongfully competing with PMG.

34.    McNally and Hallmark's retention of the profits derived from the scheme described above violates the fundamental principals of equity and good conscience.

35.    The acts of McNally and Hallmark were intentional, unjustified, wilful, wanton, and in reckless disregard for the rights of PMG.

6281585v1 884549

## Count I
## Breach of Fiduciary Duty
(against McNally)

36.     PMG realleges paragraphs 1 through 35 above as this paragraph 36 as though fully set forth herein.

37.     As an employee and agent of PMG, McNally owed PMG certain fiduciary duties, including a duty of loyalty during his employment.

38.     An agent is required to act solely for the principal in all matters related to the agency and to refrain from competing with the principal.

39.     McNally breached the duties he owed to PMG by engaging in the acts, agreements, and scheme described above, including, but not limited to: diverting corporate opportunities to himself; diverting corporate opportunities to Hallmark; diverting corporate opportunities to other third parties; soliciting and inducing one of PMG's biggest clients to move its work to McNally and Hallmark; entering into an agreement with Hallmark by which McNally provided fulfillment work to Hallmark in exchange for Hallmark providing circulation management work to McNally; using and disclosing PMG's proprietary proposal and pricing information; using and disclosing to Hallmark PMG's client information; using other PMG resources including its email server to compete with PMG; disparaging PMG to third parties; accepting salary and health benefits from PMG while failing to make efforts to advance its interests and instead working contrary to its interests; failing to disclose the business relationships he had developed and the monies he was receiving from clients and Hallmark; misleading PMG; and conspiring against PMG and failing to disclose that conspiracy.

40.     As a direct and proximate cause of McNally's breaches, PMG sustained damages, including, but not limited to, lost profits from the diverted business opportunities, the payment of over $150,000 in salary to McNally during the time he was breaching his duties, and damage to

9

its reputation and good will.

WHEREFORE, plaintiff, PMG Data Services, Inc., respectfully requests this Court to enter judgment in its favor and against defendant Robert J. McNally; awarding plaintiff restitution through imposition of a constructive trust on the monies received by McNally as a result of the diverted business opportunities and the compensation paid to McNally by PMG during the time he was breaching his duties to PMG; damages equal to the business opportunities diverted to Hallmark; punitive damages, prejudgment interest, costs; and such other and further relief as the Court deems appropriate.

**Count II**
**<u>Usurping Business Opportunities</u>**
(Against McNally)

41.    PMG realleges paragraphs 1 through 35 above as this paragraph 41 as though fully set forth herein.

42.    As an employee and agent of PMG, McNally owed PMG certain fiduciary duties, including a duty of loyalty during his employment.

43.    McNally obtained and was presented with business opportunities for circulation management and fulfillment work. Those opportunities were reasonably incident to the then present or prospective business of PMG and were opportunities in which the corporation had the capacity to engage. Indeed, at the time the opportunities arose continuing through the present, PMG was engaged in the business of providing the exact services sought by the individuals and organizations presenting the opportunities.

44.    PMG was never given an opportunity to decide whether to pursue or accept any of these opportunities because McNally never disclosed them to PMG and in fact concealed them from PMG.

45.    As a direct and proximate result of McNally's diversion of these opportunities,

10

PMG has sustained damages, including the lost profits associated with the diverted opportunities.

WHEREFORE, plaintiff, PMG Data Services, Inc., respectfully requests this Court to enter judgment in its favor and against defendant Robert J. McNally; awarding plaintiff restitution through imposition of a constructive trust on the monies received by McNally as a result of the diverted business opportunities and the compensation paid to McNally by PMG during the time he was breaching his duties to PMG; damages equal to the business opportunities diverted to Hallmark; punitive damages, prejudgment interest, costs; and such other and further relief as the Court deems appropriate.

### Count III
### Constructive Fraud
(Against McNally)

46.     PMG realleges paragraphs 1 through 35 above as this paragraph 46 as though fully set forth herein.

47.     As an employee and agent of PMG, McNally owed PMG certain fiduciary duties, including a duty of loyalty during his employment.

48.     An agent is required to act solely for the principal in all matters related to the agency and to refrain from competing with the principal.

49.     McNally breached the duties he owed to PMG by engaging in the acts, agreements, and scheme described above, including, but not limited to: diverting corporate opportunities to himself; diverting corporate opportunities to Hallmark; diverting corporate opportunities to other third parties; soliciting and inducing one of PMG's biggest clients to move its work to McNally and Hallmark; entering into an agreement with Hallmark by which McNally provided fulfillment work to Hallmark in exchange for Hallmark providing circulation management work to McNally; using and disclosing PMG's proprietary proposal and pricing information; using and disclosing to Hallmark PMG's client information; using other PMG

6281585v1 884549

resources including its email server to compete with PMG; disparaging PMG to third parties, accepting salary and health benefits from PMG while failing to make efforts to advance its interests and instead working contrary to its interests; failing to disclose the business relationships he had developed and the monies he was receiving from clients and Hallmark; misleading PMG; and conspiring against PMG and failing to disclose that conspiracy.

50.    McNally profited from the breaches of his fiduciary duties described above through his receipt of monies obtained from the diverted business opportunities, including the amounts paid to him for circulation management work; his receipt of compensation from PMG, and any monies paid to him by Hallmark and/or Giles.

51.    As a direct and proximate cause of McNally's breaches, PMG sustained damages, including, but not limited to, lost profits from the diverted business opportunities, the payment of over $150,000 in salary to McNally during the time he was breaching his duties, and damage to its reputation and good will.

WHEREFORE, plaintiff, PMG Data Services, Inc., respectfully requests this Court to enter judgment in its favor and against defendant Robert J. McNally; awarding plaintiff restitution through imposition of a constructive trust on the monies received by McNally as a result of the diverted business opportunities and the compensation paid to McNally by PMG during the time he was breaching his duties to PMG; damages equal to the business opportunities diverted to Hallmark; punitive damages, prejudgment interest, costs; and such other and further relief as the Court deems appropriate.

### Count IV
### Unjust Enrichment
(Against McNally)

52.    PMG realleges paragraphs 1 through 35 above as this paragraph 52 as though fully set forth herein.

12

53.     Through and as a result of the wrongful conduct described above, McNally has received monies from third parties in connection with circulation management work.

54.     McNally's receipt of these monies was to PMG's detriment.

55.     In addition, McNally has been unjustly enriched as a result of his receipt and retention of the salary and benefits paid to him by PMG during the time he was engaged in the wrongful conduct described above.

56.     McNally's retention of the aforesaid benefits violates the fundamental principles of justice, equity, and good conscience.

WHEREFORE, plaintiff, PMG Data Services, Inc., respectfully requests this Court to enter judgment in its favor and against defendant Robert J. McNally; awarding plaintiff restitution through imposition of a constructive trust on the monies received by McNally as a result of the diverted business opportunities and the compensation paid to McNally by PMG during the time he was breaching his duties to PMG; damages equal to the business opportunities diverted to Hallmark; punitive damages, prejudgment interest, costs; and such other and further relief as the Court deems appropriate.

**Count V**
**Inducing Breach of Fiduciary Duty**
**(Against Hallmark)**

57.     PMG realleges paragraphs 1 through 35 above as this paragraph 57 as though fully set forth herein.

58.     As an employee and agent of PMG, McNally owed PMG certain fiduciary duties, including a duty of loyalty during his employment.

59.     An agent is required to act solely for the principal in all matters related to the agency and to refrain from competing with the principal.

60.     McNally breached the duties he owed to PMG by engaging in the acts,

13

6281585v1 884549

agreements, and scheme described above, including, but not limited to: diverting corporate opportunities to himself; diverting corporate opportunities to Hallmark; diverting corporate opportunities to other third parties; soliciting and inducing one of PMG's biggest clients to move its work to McNally and Hallmark; entering into an agreement with Hallmark by which McNally provided fulfillment work to Hallmark in exchange for Hallmark providing circulation management work to McNally; using and disclosing PMG's proprietary proposal and pricing information; using and disclosing to Hallmark PMG's client information; using other PMG resources including its email server to compete with PMG; disparaging PMG to third parties, accepting salary and health benefits from PMG while failing to make efforts to advance its interests and instead working contrary to its interests; failing to disclose the business relationships he had developed and the monies he was receiving from clients and Hallmark; misleading PMG; and conspiring against PMG and failing to disclose that conspiracy.

61.    Hallmark, through its employee and agent Giles and other employees and/or agents presently unknown to PMG, knowingly participated in and induced McNally's breaches of his fiduciary duties to PMG and accepted benefits of those breaches, including the profits derived from the diverted fulfillment work.

62.    As a direct and proximate cause of the wrongful acts of Hallmark and McNally, PMG sustained damages, including, but not limited to, lost profits from the diverted business circulation management work, lost profits from the diverted fulfillment work, the payment of over $150,000 in salary to McNally during the time he was breaching his duties, and damages to its reputation and good will.

WHEREFORE, plaintiff, PMG Data Services, Inc., respectfully requests this Court to enter judgment in its favor and against defendant Hallmark Data Systems LLC, awarding plaintiff restitution through imposition of a constructive trust on the monies received by

14

Hallmark as a result of the diverted business opportunities; damages equal to the amount

received by McNally as a result of diverted business opportunities and the amount paid by PMG

to McNally during the time he was breaching his duties to PMG; punitive damages, prejudgment

interest, costs; and such other and further relief as the Court deems appropriate.

**Count VI**
**Aiding and Abetting Breach of Fiduciary Duty**
(Against Hallmark)

63.     PMG realleges paragraphs 1 through 35 above as this paragraph 63 as though

fully set forth herein.

64.     As an employee and agent of PMG, McNally owed PMG certain fiduciary duties,

including a duty of loyalty during his employment.

65.     An agent is required to act solely for the principal in all matters related to the

agency and to refrain from competing with the principal.

66.     McNally breached the duties he owed to PMG by engaging in the acts,

agreements, and scheme described above, including, but not limited to: diverting corporate

opportunities to himself; diverting corporate opportunities to Hallmark; diverting corporate

opportunities to other third parties; soliciting and inducing one of PMG's biggest clients to move

its work to McNally and Hallmark; entering into an agreement with Hallmark by which McNally

provided fulfillment work to Hallmark in exchange for Hallmark providing circulation

management work to McNally; using and disclosing PMG's proprietary proposal and pricing

information; using and disclosing to Hallmark PMG's client information; using other PMG

resources including its email server to compete with PMG; disparaging PMG to third parties,

accepting salary and health benefits from PMG while failing to make efforts to advance its

interests and instead working contrary to its interests; failing to disclose the business

relationships he had developed and the monies he was receiving from clients and Hallmark;

15

misleading PMG; and conspiring against PMG and failing to disclose that conspiracy.

67.     Hallmark, through its employee and agent Giles and other employees and/or agents presently unknown to PMG, aided McNally in his wrongful acts as described above; was aware of its role in the overall tortious activity at the time it provided that assistance; and knowingly and substantially assisted McNally in these wrongful acts.

68.     As a direct and proximate cause of the wrongful acts of Hallmark and McNally, PMG sustained damages, including, but not limited to, lost profits from the diverted business circulation management work, lost profits from the diverted fulfillment work, the payment of over $150,000 in salary to McNally during the time he was breaching his duties, and damage to its reputation and good will.

WHEREFORE, plaintiff, PMG Data Services, Inc., respectfully requests this Court to enter judgment in its favor and against defendant Hallmark Data Systems LLC, awarding plaintiff restitution through imposition of a constructive trust on the monies received by Hallmark as a result of the diverted business opportunities; damages equal to the amount received by McNally as a result of diverted business opportunities and the amount paid by PMG to McNally during the time he was breaching his duties to PMG; punitive damages, prejudgment interest, costs; and such other and further relief as the Court deems appropriate.

### Count VII
### Civil Conspiracy
(Against Hallmark)

69.     PMG realleges paragraphs 1 through 35 above as this paragraph 69 as though fully set forth herein.

70.     While McNally was employed by PMG, Hallmark and McNally combined for the purpose of diverting to themselves business opportunities belonging to PMG.

71.     In furtherance of their unlawful purposes and means, Hallmark committed the

6281585v1 884549

overt tortious and/or unlawful acts described above.

72.    Hallmark knowingly and voluntarily participated in the common scheme and tortious acts described above.

73.    As a direct and proximate cause of the wrongful acts of Hallmark and McNally, PMG sustained damages, including, but not limited to, lost profits from the diverted business circulation management work, lost profits from the diverted fulfillment work, the payment of over $150,000 in salary to McNally during the time he was breaching his duties, and damage to its reputation and good will.

WHEREFORE, plaintiff, PMG Data Services, Inc., respectfully requests this Court to enter judgment in its favor and against defendant Hallmark Data Systems LLC, in an amount to be determined at the time of trial and believed to be in excess of $300,000, including the profits lost as a result of any circulation management work performed by McNally; the profits associated with any fulfillment work performed by Hallmark which resulted from, related to, or was associated with McNally or any customer with whom McNally communicated regarding such fulfillment work; damages to plaintiff's reputation and good will; punitive damages, prejudgment interest, costs, and such other and further relief as the Court deems appropriate.

### Count VIII
### Unjust Enrichment
(Against Hallmark)

74.    PMG realleges paragraphs 1 through 35 above as this paragraph 74 as though fully set forth herein.

75.    As a result of the diversion of business opportunities belonging to PMG, Hallmark has received monies from third parties for fulfillment work.

76.    Hallmark received those monies as a result of its wrongful conduct and that of its co-conspirator, McNally.

17

6281585v1 884549

77.    Hallmark's receipt of those monies was to PMG's detriment.

78.    Hallmark has been unjustly enriched through its receipt of those monies.

79.    Hallmark's retention of those monies violates the fundamental principles of justice, equity, and good conscience.

WHEREFORE, plaintiff, PMG Data Services, Inc., respectfully requests this Court to enter judgment in its favor and against defendant Hallmark Data Systems LLC, awarding plaintiff restitution through imposition of a constructive trust on the monies received by Hallmark as a result of the diverted business opportunities; damages equal to the amount received by McNally as a result of diverted business opportunities and the amount paid by PMG to McNally during the time he was breaching his duties to PMG; punitive damages, prejudgment interest, costs; and such other and further relief as the Court deems appropriate.

**Count IX**
**<u>Vicarious Liability</u>**
(Against Hallmark)

80.    PMG realleges paragraphs 1 through 35 above as this paragraph 80 as though fully set forth herein.

81.    McNally was an agent of Hallmark.

82.    The scope of McNally's agency for Hallmark included McNally diverting business opportunities for fulfillment work from PMG to Hallmark, in exchange for McNally performing the circulation management work associated with that fulfillment work.

83.    PMG sustained damages as a result of McNally's wrongful acts, including lost profits on diverted business and the compensation paid to McNally during the time he was breaching the duties he owed to PMG.

84.    The wrongful acts of McNally described above were undertaken pursuant to the direction of Hallmark. Further, Giles of Hallmark provided McNally with detailed instructions

18

regarding the companies and persons McNally should approach, the manner in which McNally

should approach them, and the terms of the proposals McNally made to those companies and

persons on behalf of himself and Hallmark.

WHEREFORE, plaintiff, PMG Data Services, Inc., respectfully requests this Court to

enter judgment in its favor and against defendant Hallmark Data Systems LLC, in an amount to

be determined at the time of trial and believed to be in excess of $300,000, including an amount

equal to the profits derived by defendants from diverted business opportunities, the amounts paid

to McNally during the time he was breaching his duties to plaintiff, prejudgment interest, costs,

and such other and further relief as the Court deems appropriate.

### JURY TRIAL DEMANDED

Respectfully submitted,

PMG DATA SERVICES, INC.

By: _____

One of Its Attorneys

Adam L. Saper
HINSHAW & CULBERTSON LLP
222 N. LaSalle Street, Suite 300
Chicago, Illinois 60601
(312) 704-3000
fax: (312) 704-3001
asaper@hinshawlaw.com

19