## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| PMG Data Services, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 08 C 854 |
| v. | ) | |
| | ) | Honorable Judge Norgle |
| Robert J. McNally and | ) | |
| Hallmark Data Systems LLC, | ) | Magistrate Judge Ashman |
| | ) | |
| Defendants. | ) | |

### McNALLY'S ANSWER AND AFFIRMATIVE DEFENSES

Defendant, Robert J. McNally ("McNally"), by and through his attorneys, Riordan,

Fulkerson, Hupert & Coleman, hereby states his Answer and Affirmative Defenses to Plaintiff's

Complaint as follows:

#### Parties

1.      PMG Data Services, Inc. ("PMG") is a Minnesota corporation with its principal
place of business located in Mendota Heights, Minnesota.

**ANSWER:**    McNally admits the allegations set forth in paragraph 1.

2.      Robert J. McNally ("McNally") is an individual who resides in Niles, Illinois.

**ANSWER:**    McNally admits the allegation set forth in paragraph 2.

3.      Hallmark Data Systems LLC ("Hallmark") is a Delaware limited liability
company with its principal place of business located in Skokie, Illinois.

**ANSWER:**    McNally is without knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 4 and, accordingly, they are denied.

**Jurisdiction and Venue**

4.      Jurisdiction is proper pursuant to 28 U.S.C. §1332 because complete diversity of citizenship exists and the amount in controversy exceeds $75,000.

**ANSWER:**    McNally is without knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 4 and, accordingly, they are denied.

5.      PMG is a citizen of Minnesota. McNally is a citizen of Illinois. Hallmark is a citizen of Illinois, Delaware and New York. The members of Hallmark are one or more of the following persons and/or entities: James Kuchinski; Raymond Miller; Tinicum Investors LP; and/or Tinicum Capital Partners LP. Tinicum Investors LP and Tinicum Partners LP are each Delaware limited partnerships and each has its principal places of business located in New York. The partners of Tinicum Investors LP and of Tinicum Capital Partners LP are one or more of the following persons and/or entities: Eric M. Ruttenberg; Derald H. Ruttenberg; John C. Ruttenberg; Katherine T. Ruttenberg; Hattie Ruttenberg; RUTCO Inc.; Tinicum Associates, Inc.; Tinicum Enterprise, Inc.; Tinicum Foreign Investments Corporation; Robert J. Kelly; Seth M. Hendon; John F. Keane and/or Edward Civello. Kuchinski and Hallmar are citizens of the State of Illinois. Eric M. Ruttenberg, Derald H. Ruttenberg, John C. Ruttenberg, Katherin T. Ruttenberg, Hattie Ruttenberg, Robert J. Kelly, Seth M. Hendon, John F. Keane and Edward Civello are citizens of the State of New York. RTUCO Inc.; Tinicum Associates, Inc.; Tinicum Foreign Investments Corporation; and Tinicum Enterprise, Inc. are Delaware corporationis with their respective principal places of business located in New York. Upon information and belief, none of the individual members of Hallmark or the individuals comprising any member-entities are citizens of the State of Minnesota.

**ANSWER:**    McNally is without knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 5 and, accordingly, they are denied.

6.      Venue is proper pursuant to 28 U.S.C. § 1391(a) because the defendants reside in this District and because a substantial part of the events giving rise to the claims asserted herein occurred in this District.

**ANSWER:**    McNally admits the allegations set forth in paragraph 6.

**Allegations Common to All Counts**

7.      PMG is engaged in the business of providing subscription fulfillment and circulation management services to business to business publishers of magazines and other print publication. PMG has facilities located in Mendota Heights, Minnesota and Chicago, Illinois.

**ANSWER:**    McNally admits that PMG is in the business of providing subscription

fulfillment and circulation management and that it has a facility in Mendota Heights, Minnesota.

However, McNally denies that PMG maintains a facility in Chicago, Illinois, as the office remains vacant. Further, the sole PMG Illinois-based employee, Sam Bhatt, works out of his home.

8.    Hallmark is also in the business of providing subscription fulfillment services and is a direct competitor of PMG. PMG's share of the fulfillment market is less than one percent, while Hallmark is the dominant player in the fulfillment market.

**ANSWER:**    McNally admits that Hallmark is in the business of providing subscription fulfillment services; however, McNally neither admits nor denies that Hallmark is a direct competitor of PMG, as such conclusion depends on one's definition of "direct competitor". As to percentages of market share within the fulfillment market, McNally is without knowledge or information sufficient to form a belief as to the truth of this allegation and, accordingly, it is denied.

9.    PMG employed McNally as a General Manager for approximately five years, from January 2003 until the scheme described below was discovered and he was terminated on December 17, 2007. McNally was PMG's single highest paid employee. He had exclusive management responsibility for the Illinois facility and was integrally involved in both the subscription fulfillment and circulation management aspects of PMG's business. McNally had broad discretion in the performance of his duties and performed the circulation management function of PMG's business with a significant degree of autonomy. McNally was also privy to all of PMG's confidential and proprietary information, including, but not limited to, its client lists, client contact information, proposals, pricing structures, and profit margins.

**ANSWER:**    McNally admits that he was employed by PMG from January of 2003 until his termination; however, McNally denies the allegation that he was terminated upon the discovery of the alleged "scheme". Dick Benson ("Benson") was made aware of McNally's operating as an independent consultant in 2006, and remained aware of such in 2007.

McNally admits that his title was that of a "General Manager", but denies that he had the authority which might normally be associated with that title.

3

McNally is without knowledge or information sufficient to form a belief as to the truth of the allegation pertaining to salaries at PMG and, accordingly, it is denied.

McNally denies the allegation that he had "exclusive management responsibility" as he was not integrally involved in both the subscription fulfillment and circulation management aspects of PMG's business. Also, McNally's role diminished over time when the number of employees at PMG in Illinois shrank from around twenty in 2003 to two, including McNally, as of November 30, 2007, at which time McNally was verbally informed by Benson that McNally's future with PMG would be as an independent consultant.

Further, McNally performed circulation management duties with a certain amount of discretion. Benson and McNally shared in the performance of these duties; in fact, Benson's responsibility grew as PMG added titles to its roster without any notification to, or involvement by, the Illinois office or its employees. Those publications and their databases were stored in Minnesota and neither the Illinois office nor its employees had access to either. PMG maintained a consultant in Minnesota who McNally expected PMG would use more over the course of time, thereby, utilizing McNally less over time, as the bulk of PMG's business continued to shift to Minnesota.

McNally was not privy to all of PMG's confidential and proprietary information; his access was limited to the portion of the client list, contact information and proposals which pertained to his accounts only. McNally had limited awareness of PMG's pricing structure and no knowledge about its profit margins.

10.    Glen Giles ("Giles") is the Director of New Business Development for Hallmark. The acts and omissions of Giles described herein were undertaken by him as an employee and agent of Hallmark and with Hallmark's actual and/or constructive knowledge and actual, constructive, and/or apparent authority. In addition, Hallmark later ratified the acts of Giles described herein.

4

**ANSWER:**    Mr. Giles has died since the filing of the Complaint. McNally is without

knowledge or information sufficient to form a belief as to the truth of the factual allegations of

Paragraph 10 and, accordingly, they are denied. McNally further notes that Paragraph 10

contains legal conclusions to which he makes no response.

11.    At all times referenced herein, Hallmark and Giles had actual knowledge that
McNally was employed by PMG and that PMG was in the business of providing circulation
management and fulfillment services in connection with print publications.

**ANSWER:**    McNally admits that Giles had such knowledge. McNally is without

knowledge or information sufficient to form a belief as to the truth of the other allegations of

Paragraph 11 and, accordingly, they are denied.

12.    Since at least January of 2006, McNally has been working as an agent of
Hallmark with actual authority to engage in the acts described herein. In addition, Hallmark later
ratified the acts of McNally described herein.

**ANSWER:**    McNally denies the allegations set forth in Paragraph 12.

13.    With the encouragement and assistance of Giles and Hallmark, almost two years
before PMG discovered their scheme, McNally was directly competing with PMG and diverting
business opportunities to himself and Hallmark.

**ANSWER:**    With the encouragement of Glen Giles ("Giles"), McNally was attempting

to build a roster of potential clients for circulation consulting, however, McNally was not

competing with PMG because, at that time, PMG did not fulfill a circulation management

capacity for any one client exclusively. The majority of PMG's clients were fulfillment

customers and some of them had PMG perform the circulation management function as well.

With regard to the reference of "almost two years before PMG discovered their scheme", please

see McNally's Answer to Paragraph 9, whereby McNally denies this allegation. McNally denies

the remaining allegations of Paragraph 13.

14.    While employed by PMG, McNally diverted several opportunities for circulation
management services to himself and several opportunities for fulfillment services to Hallmark.

In exchange for the diversion of fulfillment work, Hallmark fed McNally circulation management work which McNally kept for himself and did not disclose to PMG.

**ANSWER:**    McNally denies the allegations in paragraph 14 pertaining to "diverted several opportunities for circulation management services to himself and several opportunities for fulfillment services to Hallmark" while McNally was employed by PMG. After nearly four years of bounced paychecks, eviction notices, and a variety of fraudulent actions by Dick Benson and John Benson directed against clients, vendors and employees, Glen Giles, aware of McNally's frustration, and aware that Dick Benson knew of McNally's working as an independent contractor,  referred some circulation management prospects to McNally. There exists no signed contract or agreement between McNally and said "diverted ... business opportunit[y]".

15.    While McNally was employed by PMG, McNally and Hallmark caused one of PMG's biggest clients, Hendon Publishing Company, to terminate its contract with PMG and to enter into a contract with McNally personally for circulation management work and with Hallmark for fulfillment services work. PMG had been providing both of those services to Hendon and Hendon's business accounted for almost twenty percent (20%) of PMG's revenues.

**ANSWER:**    McNally denies the allegations set forth in Paragraph 15 as to what caused Hendon to leave PMG. As PMG did not hold to its contract, Hendon declined to renew its contract with PMG when it was due to expire, notified PMG ninety days prior to the end of the contract term, and continued business with PMG on a month-to-month basis. After PMG repeatedly failed to perform even on this month-to-month basis, Hendon sought other fulfillment options and eventually settled on Hallmark, expressing a desire to continue working with McNally as its circulation consultant.

With regard to Hendon's business accounting "for almost twenty percent (20%) of PMG's revenues", McNally is without knowledge or information sufficient to form a belief as to the truth of this allegation of Paragraph 15 and, accordingly, it is denied.

6

16.    McNally used PMG's own resources to compete with PMG. McNally and Giles regularly communicated through McNally's PMG email account about the diversion of PMG's business opportunities and documents the defendants used to compete with PMG were found on the hard drive of the computer McNally used at PMG, including proposals submitted to some of the diverted business opportunities.

**ANSWER:**    McNally admits that he used PMG's resources to perform some of the

circulation management functions for Newport and that he made proposals for work for himself

using these resources; however, that was with Dick Benson's knowledge and consent. However,

McNally denies the allegations pertaining to "diversion of PMG's business opportunities" in that

(1) there exists or existed no signed contract or agreement between McNally and said "diverted

business opportunities"; and (2) said prospects were not interested in doing business with PMG.

17.    In an email dated January 3, 2006 from McNally to Marty McLellan of Newport Communications, the publisher of Heavy Duty Trucking Magazine ("HDT"), McNally stated that he had spoken to Giles of Hallmark regarding HDT's contract with its current vendor. McNally proceeded to tell McLellan how to set that vendor up for a breach of contract. In a later email from McNally to McLellan, September 25, 2006, McNally confirmed that he would personally provide circulation management services to HDT and that Hallmark would provide the subscription fulfillment services to HDT.

**ANSWER:**    Marty McClellan ("McClellan") reviewed his Stark contract with McNally

when he was interested in leaving because he was not satisfied with its current vendor's

performance. McNally and McClellan began these discussions in 2005 because McClellan

thought the contract had rolled over for one year to the end of 2005 when, in fact, it had rolled

over to the end of 2006. As a result, the discussion was deferred for one year. Both discussed

what options were available to McClellan according to the terms of the contract besides the

option of staying until the end of its term. One of the options was to find three instances where

the vendor had made mistakes. Additionally, some of the discussions regarding the Stark

contract were had with Dick Benson earlier in 2005 when PMG was still being considered. At

that time, PMG had completed a phone project for Newport in connection with SSI in 2004 with

7

disappointing results and also completed and email project with equally disappointing results;

both of which impacted McClellan's decision to pass on PMG's proposal. McNally states that

any e-mail from himself to McClellan dated September 25, 2006 speaks for itself.

18.    A series of emails dated September 7, 2006 reflect that Giles and Hallmark had referred a potential circulation management client, AVN, to McNally. In exchange, McNally tried to induce AVN to give its fulfillment work to Hallmark, telling AVN that Hallmark is "competent and easy to work with."

**ANSWER:**    AVN approached Giles of Hallmark for fulfillment work. Giles referred

AVN to McNally as a potential circulation management client. AVN requested of McNally his

opinion regarding Hallmark's work product. In response, McNally, as a previous representative

and consultant of Hallmark, gave his opinion. McNally denies the remaining allegations set

forth in Paragraph 18.

19.    McNally and Hallmark solicited the Metal Services Center Institute ("MSCI") for its circulation management and fulfillment work. In an email dated June 29, 2007 from McNally to a representative of MSCI, McNally thanks the contact for meeting with him the day before and proposes that McNally perform their circulation management work and Hallmark provide the fulfillment services to MSCI.

**ANSWER:**    MSCI contacted McNally and, in turn McNally responded by setting a

meeting with MSCI. McNally never referred MSCI to Hallmark in this meeting or in his e-mail

correspondence of June 29, 2007.

20.    In an email from McNally to Giles dated July 27, 2007, McNally expresses his disappointment that he was not initially able to persuade MSCI to give him its circulation management work and Hallmark its fulfillment work. McNally asked Giles for advice on where he had gone wrong in his proposal to MSCI. Giles later replied to that email instructing McNally of what to do to try to salvage this business opportunity for McNally and Hallmark. McNally exclaimed in the July 27, 2007 email:

> "I feel more trapped in this fucking dump today than I did yesterday or this morning for that matter … One bit of weirdness from the meeting [with MSCI]. I presented it as I would do the work, not PMG, after at one point Chris said we are hiring you to do circulation or fulfillment or both and I replied it depends on what exactly you need."

**ANSWER:**    McNally denies this allegation in that nowhere in his e-mails to Giles or in his meeting with MSCI was Hallmark mentioned.  However, McNally does admit his disappointment in not securing the circulation management business.  McNally admits to contacting Giles for advice on the appropriate amount of time to wait before contacting MSCI again.  Further, the exclamation in the aforementioned e-mail describes McNally's frustration with PMG as a result of a bounced paycheck at the end of March, PMG's continued inability or unwillingness to explain missing funds debited from his paychecks, and the daily barrage of collection agency phone calls and eviction notices.  McNally's comment that he would do the work and not PMG was responsive to a comment made by an MSCI employee who stated that MCSI maintains an in-house department for managing its lists and may be able to utilize them for the fulfillment portion of its business.

21.    In a July 11, 2007 email, McNally stated that he had received a lead from Giles for some circulation management work for "newsstand guy" and that McNally had contacted this prospect to discuss McNally handling his circulation management work.

**ANSWER:**    Pete Kingwill of Hendon Publishing Company approached McNally requesting a person familiar with newsstand distribution for one of his associates.  Further, McNally, not knowing of anyone, forwarded this request to Dick Benson who also knew of no one.  As a result, McNally asked Giles for a referral.  McNally denies the further allegations set forth in Paragraph 21.

22.    In an exchange of emails between Giles and McNally on August 13, 2007, McNally advises Giles of a potential business opportunity and again expresses his ill will towards PMG: "And you wonder why I hate everybody that had ever been connected with this fucking place."  Giles replied by lauding McNally's efforts and stated: "you may have a business of your own if we keep this up." (underlining added).  Indeed, with the assistance and encouragement of Hallmark and while still employed by PMG, McNally had long since begun a "business of his own" by diverting circulation management work to his own use and fulfillment work to Hallmark.

**ANSWER:**    McNally reasserts his answers to Paragraphs 9, 13, 14 and 16 of this Complaint.

23.    Also on August 13, 2007, McNally responded to a request by Giles that McNally send him one of PMG's written proposals that fit certain criteria defined by Giles. McNally in fact sent one of PMG's written proposals to Giles. Among other things, that proposal contained PMG's pricing. McNally told Giles that this PMG proposal was "the closest to what you were looking for, for purposes of comparison, Multi titles, not 140k but in the neighborhood." Upon information and belief, McNally and Hallmark used this PMG proposal to prepare a successful proposal to one of PMG's biggest clients, Hendon Publishing Company.

**ANSWER:**    McNally admits that he sent a three year old proposal written by Bill

Coffman to Giles. This proposal was not used to prepare a proposal for Hendon Publishing

Company. At the time the e-mail was sent, Glen Giles had well over ten years of fulfillment sales

experience for at least four different fulfillment companies and did not need assistance from

McNally or Dick Benson to write a proposal. Also, Giles had conversations with Dick Benson

where, on at least one occasion, Benson revealed details of pricing used by his former company,

Online Data Services. McNally denies any remaining allegations set forth in Paragraph 23.

24.    On September 3, 2007, McNally submitted a proposal to Linux Journal in an effort to obtain circulation management work for himself and fulfillment work for Hallmark.

**ANSWER:**    McNally denies the allegations set forth in Paragraph 24 in that Mark

Irgang of Linux Journal, who worked with McNally at Omeda Communications prior to

McNally's employment with PMG, contacted McNally with inquiries regarding costs for

outsourcing fulfillment work. However, neither a contract nor agreement, written or oral, was

made between McNally and Linux Journal. Further, no reference was made in any

correspondence or communication to Hallmark.

25.    In September 7, 2007 email, Dan Johnson-Weinberger of Permanent Campaigns Consulting emailed McNally stating that he had been referred to McNally as a potential vendor for circulation management services for a magazine called More Riders Magazine. McNally replied to that email on September 11, 2007, stating that his rate for circulation management services was $100 per hour and that "if we were to do fulfillment as well it would be based on

10

both the size of the file and an estimate of the hours spent." McNally's reference to "we" was a reference to McNally and Hallmark.

**ANSWER:**    This was a lead provided by Randy Renner ("Renner") of Omeda for

fulfillment of a magazine put out by Johnaon-Wienberger with less that 500 subscribers, which is

far too small for Omeda and is too small for PMG. The smallest customer at PMG has

somewhere around 2,000 subscribers; there is not much money in providing services for a

smaller client. McNally asked Renner if he needed help with circulation or fulfillment work or

both; McNally mentioned that he would charge $100 an hour for circulation and did not give

Renner a price for fulfillment. McNally answered a few general questions and offered to meet

with Renner; however, McNally was not contacted by Renner again.

The "we" referenced in McNally's September 11, 2007 e-mail referred to McNally and

PMG and not McNally and Hallmark. Like PMG, Hallmark would have zero interest in a

magazine of that size. If one were to charge a dollar a name per year, which is not out of line for

fulfillment services, the billing would amount to less than $500.00 annually. McNally denies

any remaining allegations set forth in Paragraph 25.

26.    In the Summer and Fall of 2007, McNally and Hallmark solicited a publisher of
various magazines, Key Communications, for McNally to provide circulation management
services and Hallmark to provide fulfillment services. McNally and Hallmark later submitted a
written proposal and sample budget to provide those services to Key Communications. On or
about September 5, 2007, McNally traveled to Virginia and met with representatives of Key
Communications. On September 10, 2007, McNally and Hallmark submitted another written
proposal to Key Communications to provide these services. A representative of Key
Communications asked McNally to confirm that he was able to "subcontract the fulfillment
work," and McNally confirmed that he could do that and could personally coordinate the
fulfillment services. Upon information and belief, McNally is providing or has provided
circulation management services to Key Communications and Hallmark has provided and is
providing fulfillment services to Key Communications.

**ANSWER:**    Key Communications, upon meeting with McNally, asked whether or not

McNally could do the circulation work, subcontract the fulfillment work and coordinate the

fulfillment services with any vendor of Key Communications' choosing, as its current circulation

vendor has an arrangement whereby he charges the client for both fulfillment and circulation and

compensates Creative Data Services (the vendor) for the fulfillment portion. However, McNally

denies that he has ever provided any circulation or fulfillment services to Key Communications.

27.    In an email dated December 5, 2007, Gail Weaverling of Stackpole Magazines
told McNally that she had been referred to McNally as a possible vendor of fulfillment services.
Upon information and belief, McNally offered this fulfillment opportunity to Hallmark, but
Hallmark was not interested in it. McNally asked Giles in an email if there was any reason
McNally should give this opportunity to PMG. Giles stated that it was "probably" a better idea
to refer the opportunity to a company called ESP Computer Services Inc. ("ESP") in order to
"curry favor" with ESP. McNally in fact referred that opportunity to ESP and in an email to
Stefan Beeli of ESP, McNally stated that he was referring this work to Beeli "discreetly." Beeli
replied that he would keep the diverted opportunity "in confidence."

**ANSWER:**    McNally denies the allegation that he offered "this fulfillment opportunity

to Hallmark." McNally admits that the fulfillment opportunity was offered to ESP; however, this

was after Dick Benson, on November 30, 2007, fired the last data entry person in Illinois and

told McNally that McNally would be used in a consulting capacity by PMG. When asked by

McNally what Benson meant by this, McNally did not receive a response but was left to assume

that his employment compensation and terms would be structured like any other consulting

arrangement where McNally would maintain the only three remaining clients in Illinois. The

fact that any new business obtained by PMG was going to its office in Minnesota and the

circulation function was being performed by either Dick Benson or a Minnesota-based consultant

named Hervey Evans, led McNally to believe that the only consulting he would be doing for

PMG was the two or three books he was currently working on: (1) *Scrap* magazine, which had

announced it was leaving; (2) *Contingencies* magazine; and (3) Hendon Publishing Company,

which announced in February of 2007 that it would not renew its contract and would work on a

month to month basis. McNally's decision to offer the lead to ESP was based on generating

circulation leads outside of Glen Giles as PMG, at that point, was moving its Illinois business to Minnesota.

28.    On December 5, 2007, McNally signed a contract with ALM Business Media ("ALM"), publisher of On-the-Go FoodService's print publication, to provide it with circulation management services. In a December 12, 2007 email, Giles of Hallmark told Tricia Speer of Hallmark, that Hallmark would have a signed contract with ALM the following day and that McNally would be doing the circulation management work for ALM.

**ANSWER:**    McNally denies that he signed a contract with ALM on December 5, 2007;

however, he admits that he sent a proposal to ALM to do work for them as an independent

contractor. McNally did not direct ALM to Hallmark. McNally is without knowledge or

information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 28

and, accordingly, they are denied.

29.    In the same December 5, 2007 email referenced above, in response to McNally's question to Giles regarding whether Hallmark had signed the contracts with Key Communications and On-the-Go FoodService, Giles told McNally: "Key – no. Let's discuss. I thought I was going to negotiate that with you, Maureen – Final contract was sent out today."

**ANSWER:**    McNally is without knowledge or information sufficient to form a belief

as to the truth of the factual allegations of Paragraph 29 and, accordingly, they are denied.

30.    Also in November and December of 2007, as alluded to above, McNally and Hallmark induced one of PMG's biggest clients, Hendon Publishing Company, to move its circulation management work from PMG to McNally and to move its fulfillment work from PMG to Hallmark.

**ANSWER:**    McNally denies the allegations set forth in Paragraph 30. McNally further

states that Hendon Publishing Company, per Pete Kingwill, left PMG due to poor work product.

31.    In December 12, 2007 email, Giles tacitly acknowledged the impropriety of the conspiracy between McNally and Hallmark, asking McNally: "Why do you keep using this e-mail account?"

**ANSWER:**     McNally denies any impropriety or conspiracy and is without knowledge

or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph

31 and, accordingly, they are denied.

32.     PMG was capable of performing the circulation management and fulfillment work with respect to each of the corporate opportunities described above, as those are precisely the services PMG is in the business of providing.  However, McNally did not present any of those opportunities to PMG or disclose their existence to PMG.  McNally further failed to disclose that he was personally performing circulation management work, referring fulfillment work to Hallmark, or that he had entered into an agreement with Hallmark pursuant to which Hallmark would refer circulation management work to McNally personally in exchange for McNally diverting fulfillment work to Hallmark.

**ANSWER:**     McNally denies the allegations set forth in Paragraph 32.

33.     McNally and Hallmark proximately caused PMG to sustain damages, including but not limited to, lost profits from the diverted business opportunities, lost profits from the loss of existing business, and the payment of over $150,000 in salary to McNally for a period of time during which he was unfairly and wrongfully competing with PMG.

**ANSWER:**     McNally denies the allegations set forth in Paragraph 33.

34.     McNally and Hallmark's retention of the profits derived from the scheme

described above violated the fundamental principals of equity and good conscience.

**ANSWER:**     McNally denies the allegations set forth in Paragraph 34.

35.     The acts of McNally and Hallmark were intentional, unjustified, willful, wanton, and in reckless disregard for the rights of PMG.

**ANSWER:**     McNally denies the allegations set forth in Paragraph 35.

### Count I
### Breach of Fiduciary Duty
(Against McNally)

36.     McNally adopts and re-alleges that Paragraph 1 through 35 above as Paragraphs 1 through 35 of this Count I as though fully set forth.

37.     As an employee and agent of PMG, McNally owed PMG certain fiduciary duties, including a duty of loyalty during his employment.

**ANSWER:**     The allegations in Paragraph 37 set forth a legal conclusion and McNally makes no response thereto.

38.     An agent is required to act solely for the principal in all matters related to the agency and to refrain from competing with the principal.

**ANSWER:**     The allegations in Paragraph 38 set forth a legal conclusion and McNally makes no response thereto.

39.     McNally breached the duties he owed to PMG by engaging in the acts, agreements, and scheme described above, including, but not limited to: diverting corporate opportunities to himself; diverting corporate opportunities to Hallmark; diverting corporate opportunities to other third parties; soliciting and inducing one of PMG's biggest clients to move its work to McNally and Hallmark; entering into an agreement with Hallmark by which McNally provided fulfillment work to Hallmark in exchange for Hallmark providing circulation management work to McNally; using and disclosing PMG's proprietary proposal and pricing information; using and disclosing to Hallmark PMG's client information; using other PMG resources including its email server to compete with PMG; disparaging PMG to third parties, accepting salary and health benefits from PMG while failing to make efforts to advance its interests and instead working contrary to its interests; failing to disclose the business relationships he had developed and the monies he was receiving from clients and Hallmark; misleading PMG; and conspiring against PMG and failing to disclose that conspiracy.

**ANSWER:**     McNally denies the allegations set forth in Paragraph 39.

40.     As a direct and proximate cause of McNally's breaches, PMG sustained damages, including, but not limited to, lost profits from the diverted business opportunities, the payment of over $150,000 in salary to McNally during the time he was breaching his duties, and damage to it reputation and good will.

**ANSWER:**     McNally denies the allegations set forth in Paragraph 40.

**Count II**
**<u>Usurping Business Opportunities</u>**
(Against McNally)

41.     McNally adopts and re-alleges that Paragraph 1 through 40 above as this Paragraph 41 as though fully set forth herein.

42.     As an employee and agent of PMG, McNally owed PMG certain fiduciary duties, including a duty of loyalty during his employment.

**ANSWER:**    The allegations in Paragraph 42 set forth a legal conclusion and McNally

makes no response thereto.

43.    McNally obtained and was presented with business opportunities for circulation management and fulfillment work. Those opportunities were reasonably incident to the then present or prospective business of PMG and were opportunities in which the corporation had the capacity to engage. Indeed, at the time the opportunities arose continuing through the present, PMG was engaged in the business of providing the exact services sought by the individuals and organizations presenting the opportunities.

**ANSWER:**    McNally denies that he was presented business opportunities to do

fulfillment work. McNally further states that PMG could not have obtained the circulation

management work in question because of its size or because of PMG's reputation. McNally also

states that PMG, through Dick Benson, knew McNally was operating as an independent

contractor. McNally admits that PMG was in the business of providing circulation management

and fulfillment work.

44.    PMG was never given an opportunity to decide whether to pursue or accept any of these opportunities because McNally never disclosed them to PMG and in fact concealed them from PMG.

**ANSWER:**    McNally denies the allegations set forth in Paragraph 44.

45.    As a direct and proximate result of McNally's diversion of these opportunities,

PMG has sustained damages, including the lost profits associated with the diverted opportunities.

**ANSWER:**    McNally denies the allegations set forth in Paragraph 45.

### Count III
### Constructive Fraud
(Against McNally)

46.    McNally adopts and re-alleges that Paragraph 1 through 45 above as this Paragraph 46 as though fully set forth herein.

47.    As an employee and agent of PMG, McNally owed PMG certain fiduciary duties, including a duty of loyalty during his employment.

**ANSWER:**    The allegations in Paragraph 47 set forth a legal conclusion and McNally

makes no response thereto.

48.    An agent is required to act solely for the principal in all matters related to the
agency and to refrain from competing with the principal.

**ANSWER:**    The allegations in Paragraph 48 set forth a legal conclusion and McNally

makes no response thereto.

49.    McNally breached the duties he owed to PMG by engaging in the acts,
agreements, and scheme described above, including, but not limited to: diverting corporate
opportunities to himself; diverting corporate opportunities to Hallmark; diverting corporate
opportunities to other third parties; soliciting and inducing one of PMG's biggest clients to move
its work to McNally and Hallmark; entering into an agreement with Hallmark by which McNally
provided fulfillment work to Hallmark in exchange for Hallmark providing circulation
management work to McNally; using and disclosing PMG's proprietary proposal and pricing
information; using and disclosing to Hallmark PMG's client information; using other PMG
resources including its email server to compete with PMG; disparaging PMG to third parties,
accepting salary and health benefits from PMG while failing to make efforts to advance its
interests and instead working contrary to its interests; failing to disclose the business
relationships he had developed and the monies he was receiving from clients and Hallmark;
misleading PMG; and conspiring against PMG and failing to disclose that conspiracy.

**ANSWER:**    McNally denies the allegations set forth in Paragraph 49.

50.    McNally profited from the breaches of his fiduciary duties described above
through his receipt of monies obtained from the diverted business opportunities, including the
amounts paid to him for circulation management work; his receipt of compensation from PMG,
and any monies paid to him by Hallmark and/or Giles.

**ANSWER:**    McNally denies the allegations set forth in Paragraph 50.

51.    As a direct and proximate cause of McNally's breaches, PMG sustained damages,
including, but not limited to, lost profits from the diverted business opportunities, the payment of
over $150,000 in salary to McNally during the time he was breaching his duties, and damage to
it reputation and good will.

**ANSWER:**    McNally denies the allegations set forth in Paragraph 51.

**Count IV**
**Unjust Enrichment**
(Against McNally)

52.    McNally adopts and re-alleges that Paragraph 1 through 51 above as this Paragraph 52 as though fully set forth herein.

53.    Through and as a result of the wrongful conduct described above, McNally has received monies from third parties in connection with circulation management work.

**ANSWER:**    McNally admits that he has received monies form third parties; however,

he denies that there was any wrongful conduct on his part.

54.    McNally's receipt of these monies was to PMG's detriment.

**ANSWER:**    McNally denies the allegation set forth in Paragraph 54.

55.    In addition, McNally has been unjustly enriched as a result of his receipt and retention of the salary and benefits paid to him by PMG during the time he was engaged in the wrongful conduct described above.

**ANSWER:**    McNally denies the allegations set forth in Paragraph 55.

56.    McNally's retention of the aforesaid benefits violates the fundamental principles of justice, equity, and good conscience.

**ANSWER:**    McNally denies the allegation set forth in Paragraph 56.

**Count V**
**Inducing Breach of Fiduciary Duty**
(Against Hallmark)

McNally makes no response to this Count V as it is not directed to him.

**Count VI**
**Aiding and Abetting Breach of Fiduciary Duty**
(Against Hallmark)

McNally makes no response to this Count VI as it is not directed to him.

**Count VII**
**Civil Conspiracy**
(Against Hallmark)

McNally makes no response to this Count VII as it is not directed to him.

**Count VIII**
**Unjust Enrichment**
(Against Hallmark)

McNally makes no response to this Count VIII as it is not directed to him.

**Count IX**
**Vicarious Liability**
(Against Hallmark)

McNally makes no response to this Count IX as it is not directed to him.

## AFFIRMATIVE DEFENSES

### AFFIRMATIVE DEFENSE I
### Unclean Hands

1.      In or about January of 2003, PMG or John Benson or Richard "Dick" Benson (the "Bensons") purchased the stock or assets of a company called Prima.  At the time, McNally was employed by Prima.

2.      When or shortly after PMG or one or both of the Bensons acquired the stock or assets of Prima, PMG or one or both of the Bensons fired, then rehired Prima's employees in Illinois.

3.      At that time, there were approximately twenty PMG employees located in Illinois.

4.      At that time, there were approximately two PMG employees located in Minnesota.

5.      On information and belief, at all relevant times herein, PMG was owned by either one or both of the Bensons.

6.      At all relevant times herein, the Bensons had direct control over all major decisions at PMG, including but not limited to hiring, firing, salary levels, payment of taxes, maintenance and administration of medical and other benefits, and relationships with the company's landlords.

7.      The Bensons did most of their work out of the Minnesota office of PMG, but made occasional trips to Illinois to inspect and run the Illinois offices.

8.      From 2003 through 2007, the Benson willfully committed a number of wrongful acts related to the Illinois offices and the employees therein.

9.      These wrongful acts included but are not necessarily limited to the following:

    a.      sending employees' payroll checks which the Bensons knew would "bounce";

    b.      collecting insurance premiums from employees and failing to turn said premiums over to the insurance company in a timely manner, leading to a lack of medical coverage for employees and their dependents;

    c.      subtracting deductions for Social Security payments from employees' paychecks and failing to remit these in a timely manner to the appropriate governmental agency;

    d.      subtracting deductions for Health Savings Accounts from their employees' paychecks and failing to deposit them in any separate account or accounts;

    e.      failing to reimburse employees and/or ex-employees for expenses and/or unused vacation time;

    f.      failing to make required payments to the Illinois Division of Employment Security;

      g.     on information and belief, failing to make appropriate tax payments to the State of Illinois, causing PMG to come under investigation by the Criminal Investigation Division of the Illinois Department of Revenue;

      h.     deliberately lying to customers about PMG's capabilities and the status of the customers' work, impeding the work of the Illinois office and negatively impacting the reputation of PMG's Illinois employees;

      i.     failing to make timely payment to various vendors, including but not limited to landlords, the electric company, Federal Express, DHL Airborne, the phone company and UPS resulting in forced moves, cutoffs of services and inability to use certain vendors, impeding the work of the Illinois office and negatively impacting the work of PMG's Illinois employees; and

      j.     failing to register as a corporate entity with the Illinois Secretary of State.

10.     The foregoing activities by the Bensons constitutes "unclean hands" and should prevent PMG from obtaining the equitable relief it seeks.

## AFFIRMATIVE DEFENSE II
### Prior Breach of Employment Relationship

11.     McNally reasserts Paragraphs 1 through 7 of Affirmative Defense I as if fully set forth in this Affirmative Defense II herein.

12.     PMG breached its duty as an employer and the employer-employee relationship with McNally by doing one or more of the following wrongful acts to McNally:

      a.     sending McNally payroll checks which the Bensons knew would "bounce";

21

      b.      collecting insurance premiums from McNally and failing to turn said premiums over to the insurance company in a timely manner, leading to a lack of medical coverage for McNally and his dependents;

      c.      subtracting deductions for Social Security payments from McNally's paychecks and failing to remit these in a timely manner to the appropriate governmental agency;

      d.      subtracting deductions for Health Savings Accounts from McNally's paychecks and failing to deposit them in any separate account or accounts;

      e.      deliberately lying to customers about PMG's capabilities and the status of the customers' work, impeding the work of McNally and negatively impacting McNally's reputation;

      f.      failing to make timely payment to various vendors, including but not limited to landlords, the electric company, Federal Express, DHL Airborne, the phone company and UPS resulting in forced moves, cutoffs of services and inability to use certain vendors, impeding and negatively impacting the work of McNally; and

      g.      failing to make required payments to the Illinois Division of Employment Security, making it impossible for McNally to obtain unemployment benefits.

13.      Because of the foregoing, PMG breached its employment relationship with McNally and is precluded from successfully suing him for breach of his duties as an employee.

### AFFIRMATIVE DEFENSE III
### Waiver

14.      McNally reasserts Paragraphs 1 through 7 of Affirmative Defense I as if fully set forth in this Affirmative Defense III.

15.    In or before 2006, Dick Benson was made aware that McNally was doing business for himself as an independent contractor in the field of circulation management.

16.    When McNally spoke to Dick Benson about his work as an independent contractor in that field in 2006, Dick Benson made no objection to McNally's doing that work.

17.    Dick Benson subsequently told McNally that his future with PMG was as an independent contractor.

18.    By Dick Benson's acting in this manner, PMG waived any rights it may have had concerning Mr. McNally's operation of his own circulation management business while a PMG employee.

**AFFIRMATIVE DEFENSE IV**
**Estoppel**

19.    McNally reasserts Paragraphs 1 through 7 of Affirmative Defense I as if fully set forth in this Affirmative Defense IV.

20.    McNally reasserts Paragraphs 15 through 16 of Affirmative Defense III as part of this Affirmative Defense IV.

21.    McNally reasonably relied on the aforementioned conduct by Dick Benson in continuing to market his services as an independent contractor in the circulation management area.

22.    The aforementioned conduct by Dick Benson estops PMG from complaining about McNally's operation of his own business while a PMG employee.

**AFFIRMATIVE DEFENSE V**
**Laches**

23.    McNally reasserts Paragraphs 1 through 7 of Affirmative Defense I as if fully set forth in this Affirmative Defense V.

23

24.     McNally reasserts Paragraphs 15 through 16 of Affirmative Defense III as part of this Affirmative Defense V.

25.     The aforementioned conduct by Dick Benson and the time that passed before McNally was fired gives rise to a defense of laches, which bars PMG from complaining about McNally's operation of his own business while a PMG employee.

WHEREFORE, Defendant Robert J. McNally seeks entry of judgment in his favor and against Plaintiff on all Counts brought against McNally in the Complaint, an award of his costs of suit and an Order granting him such other and further relief as this Court might deem appropriate.

Respectfully submitted,
Defendant, Robert J. McNally


By:  /s/ Jeffrey D. Hupert
     One of his Attorneys

Jeffrey D. Hupert
Riordan, Fulkerson, Hupert & Coleman
30 North LaSalle Street, Suite 2630
Chicago, Illinois 60602
(312) 346-4740
Fax: (312) 346-1168
jdh@rfsc-law.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of April, 2008, I electronically filed this ***Defendant Robert J. McNally's Answer*** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

### VIA ELECTRONIC MAIL

Adam L. Saper, Esq.
Hinshaw & Culbertson LLP
222 North LaSalle Street, Suite 300
Chicago, Illinois 60601
asaper@hinshawlaw.com


Under penalties as provided by law pursuant to
735 ILCS 5/1-109, I certify that the statements
set forth herein are true and correct.


By:  /s/ Jeffrey D. Hupert
     Attorney for Robert J. McNally


Jeffrey D. Hupert  (ARDC No. 3121829)
Riordan, Fulkerson, Hupert & Coleman
30 North LaSalle Street, Suite 2630
Chicago, Illinois 60602
Phone: (312) 346-4740
Fax:    (312) 346-1168
jdh@rfsc-law.com