**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PMG Data Services, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 08 C 854 |
| v. | ) | |
| | ) | Honorable Judge Norgle |
| Robert J. McNally and | ) | |
| Hallmark Data Systems LLC, | ) | Magistrate Judge Ashman |
| | ) | |
| Defendants. | ) | |

**<u>DEFENDANT HALLMARK DATA SYSTEMS, LLC'S ANSWER</u>**

Defendant, Hallmark Data Systems LLC ("Hallmark"), by and through its attorneys,

Ogletree Deakins Law Firm, hereby states his Answer and Affirmative Defenses to Plaintiff's

Complaint as follows:

**Parties**

1.     Hallmark Data Systems LLC ("HDS") is a Delaware limited liability company
with its principal place of business located in Skokie, Illinois

**<u>ANSWER</u>:**     Hallmark admits the allegations set forth in paragraph 1.

2.     Robert J. McNally ("McNally") is an individual who who resides in Niles,
Illinois.

**<u>ANSWER</u>:**     The allegations set forth in paragraph 2 do not relate to HDS.   To the

extent a response is required by HDS, HDS states it is without knowledge or information to form

a belief as to the truth of the allegations in paragraph 2 and, accordingly, they are denied.

3.     Hallmark Data Systems LLC ("Hallmark") is a Delaware limited liability
company with its principal place of business located in Skokie, Illinois.

**<u>ANSWER</u>:**     HDS admits the allegations contained in Paragraph 4 of Plaintiff's

Complaint.

**Jurisdiction and Venue**

4.       Jurisdiction is proper pursuant to 28 U.S.C. §1332 because complete diversity of citizenship exists and the amount in controversy exceeds $75,000.

**ANSWER:**     HDS is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 4 and, accordingly, they are denied.

5.       PMG is a citizen of Minnesota.  McNally is a citizen of Illinois.  Hallmark is a citizen of Illinois, Delaware and New York.  The members of Hallmark are one or more of the following persons and/or entities: James Kuchinski; Raymond Miller; Tinicum Investors LP; and/or Tinicum Capital Partners LP.  Tinicum Investors LP and Tinicum Partners LP are each Delaware limited partnerships and each has its principal places of business located in New York. The partners of Tinicum Investors LP and of Tinicum Capital Partners LP are one or more of the following persons and/or entities: Eric M. Ruttenberg; Derald H. Ruttenberg; John C. Ruttenberg; Katherine T. Ruttenberg; Hattie Ruttenberg; RUTCO Inc.; Tinicum Associates, Inc.; Tinicum Enterprise, Inc.; Tinicum Foreign Investments Corporation; Robert J. Kelly; Seth M. Hendon; John F. Keane and/or Edward Civello.  Kuchinski and Millar are citizens of the State of Illinois.  Eric M. Ruttenberg, Derald H. Ruttenberg, John C. Ruttenberg, Katherin T. Ruttenberg, Hattie Ruttenberg, Robert J. Kelly, Seth M. Hendon, John F. Keane and Edward Civello are citizens of the State of New York.  RTUCO Inc.; Tinicum Associates, Inc.; Tinicum Foreign Investments Corporation; and Tinicum Enterprise, Inc. are Delaware corporation's with their respective principal places of business located in New York.  Upon information and belief, none of the individual members of Hallmark or the individuals comprising any member-entities are citizens of the State of Minnesota.

**ANSWER:**     HDS is without knowledge or information sufficient to form a belief as to PMG or McNally's citizenship.  As for HDS, HDS denies that its current members consist of those individuals or entities set forth in Paragraph 5 and, therefore, HDS denies each and every allegation set forth in Paragraph 5.

6.       Venue is proper pursuant to 28 U.S.C. § 1391(a) because the defendants reside in this District and because a substantial part of the events giving rise to the claims asserted herein occurred in this District.

**ANSWER:**     HDS denies that PMG has meritorious claims but otherwise admits the allegations set forth in paragraph 6.

## Allegations Common to All Counts

7.     PMG is engaged in the business of providing subscription fulfillment and circulation management services to business to business publishers of magazines and other print publication.  PMG has facilities located in Mendota Heights, Minnesota and Chicago, Illinois.

**ANSWER:**     HDS admits that PMG is in the business of providing subscription

fulfillment and circulation management and that it has a facility in Mendota Heights, Minnesota.

However, HDS is without knowledge or information sufficient to form a belief as to remaining

allegations in paragraph 7 and, accordingly, they are denied.

8.     Hallmark is also in the business of providing subscription fulfillment services and is a direct competitor of PMG.  PMG's share of the fulfillment market is less than one percent, while Hallmark is the dominant player in the fulfillment market.

**ANSWER:**     HDS admits that it is in the business of providing subscription fulfillment

services; however, HDS is without knowledge or information sufficient to form a belief as to

remaining allegations in paragraph 8 and, accordingly, they are denied.

9.     PMG employed McNally as a General Manager for approximately five years, from January 2003 until the scheme described below was discovered and he was terminated on December 17, 2007.  McNally was PMG's single highest paid employee.  He had exclusive management responsibility for the Illinois facility and was integrally involved in both the subscription fulfillment and circulation management aspects of PMG's business.  McNally had broad discretion in the performance of his duties and performed the circulation management function of PMG's business with a significant degree of autonomy.  McNally was also privy to all of PMG's confidential and proprietary information, including, but not limited to, its client lists, client contact information, proposals, pricing structures, and profit margins.

**ANSWER:**     HDS is without knowledge or information sufficient to form a belief as to

allegations in paragraph 9 and, accordingly, they are denied

10.     Glen Giles ("Giles") is the Director of New Business Development for Hallmark. The acts and omissions of Giles described herein were undertaken by him as an employee and agent of Hallmark and with Hallmark's actual and/or constructive knowledge and actual, constructive, and/or apparent authority.  In addition, Hallmark later ratified the acts of Giles described herein.

**ANSWER:**    Paragraph 10 of Plaintiff's Complaint calls for a legal conclusion, to which no response is required.  To the extent a response is required, HDS denies any wrongdoing and further denies Giles is an employee of HDS as Giles is now deceased.  HDS states that it is without knowledge or information sufficient to form a belief as to remaining allegations in paragraph 10 and, accordingly, they are denied.

11.    At all times referenced herein, Hallmark and Giles had actual knowledge that McNally was employed by PMG and that PMG was in the business of providing circulation management and fulfillment services in connection with print publications.

**ANSWER:**    HDS admits the allegations contained in paragraph 11.

12.    Since at least January of 2006, McNally has been working as an agent of Hallmark with actual authority to engage in the acts described herein.  In addition, Hallmark later ratified the acts of McNally described herein.

**ANSWER:**    HDS denies the allegations set forth in paragraph 12.

13.    With the encouragement and assistance of Giles and Hallmark, almost two years before PMG discovered their scheme, McNally was directly competing with PMG and diverting business opportunities to himself and Hallmark.

**ANSWER:**    HDS denies the allegations set forth in paragraph 13.

14.    While employed by PMG, McNally diverted several opportunities for circulation management services to himself and several opportunities for fulfillment services to Hallmark. In exchange for the diversion of fulfillment work, Hallmark fed McNally circulation management work which McNally kept for himself and did not disclose to PMG.

**ANSWER:**    HDS denies the allegations set forth in paragraph 14.

15.    While McNally was employed by PMG, McNally and Hallmark caused one of PMG's biggest clients, Hendon Publishing Company, to terminate its contract with PMG and to enter into a contract with McNally personally for circulation management work and with Hallmark for fulfillment services work.  PMG had been providing both of those services to Hendon and Hendon's business accounted for almost twenty percent (20%) of PMG's revenues.

**ANSWER:**    HDS admits Hendon Publishing Company terminated its contract with PMG and that Hendon Publishing Company retained HDS for its fulfillment services work. HDS is without knowledge or information sufficient to form a belief as to the percentage of

PMG's revenues for which Hendon Publishing Company accounted.  HDS denies the remaining allegations set forth in paragraph 15.

16.     McNally used PMG's own resources to compete with PMG.  McNally and Giles regularly communicated through McNally's PMG email account about the diversion of PMG's business opportunities and documents the defendants used to compete with PMG were found on the hard drive of the computer McNally used at PMG, including proposals submitted to some of the diverted business opportunities.

**ANSWER:**     HDS admits that McNally and Giles communicated through McNally's e-mail account with PMG and that McNally may have forwarded one or more proposals to Giles but denies the remaining allegations set forth in paragraph 16.

17.     In an email dated January 3, 2006 from McNally to Marty McLellan of Newport Communications, the publisher of Heavy Duty Trucking Magazine ("HDT"), McNally stated that he had spoken to Giles of Hallmark regarding HDT's contract with its current vendor. McNally proceeded to tell McLellan how to set that vendor up for a breach of contract.  In a later email from McNally to McLellan, September 25, 2006, McNally confirmed that he would personally provide circulation management services to HDT and that Hallmark would provide the subscription fulfillment services to HDT.

**ANSWER:**     HDS it is without knowledge or information sufficient to form a belief as to allegations in paragraph 17 and, accordingly, they are denied.

18.     A series of emails dated September 7, 2006 reflect that Giles and Hallmark had referred a potential circulation management client, AVN, to McNally.  In exchange, McNally tried to induce AVN to give its fulfillment work to Hallmark, telling AVN that Hallmark is "competent and easy to work with."

**ANSWER:**     HDS admits that Giles referred AVN to McNally as a potential circulation management client, that AVN requested of McNally his opinion regarding HDS' work product and that McNally gave AVN his opinion.  HDS is it is without knowledge or information sufficient to form a belief as to remaining allegations set forth in paragraph 18 and, accordingly, they are denied.

19.     McNally and Hallmark solicited the Metal Services Center Institute ("MSCI") for its circulation management and fulfillment work.  In an email dated June 29, 2007 from McNally to a representative of MSCI, McNally thanks the contact for meeting with him the day before

and proposes that McNally perform their circulation management work and Hallmark provide the fulfillment services to MSCI.

**ANSWER:**    HDS denies the allegations set forth in paragraph 19 of Plaintiff's

Complaint.

20.    In an email from McNally to Giles dated July 27, 2007, McNally expresses his disappointment that he was not initially able to persuade MSCI to give him its circulation management work and Hallmark its fulfillment work.  McNally asked Giles for advice on where he had gone wrong in his proposal to MSCI.  Giles later replied to that email instructing McNally of what to do to try to salvage this business opportunity for McNally and Hallmark.  McNally exclaimed in the July 27, 2007 email:

> "I feel more trapped in this fucking dump today than I did yesterday or this morning for that matter … One bit of weirdness from the meeting [with MSCI].  I presented it as I would do the work, not PMG, after at one point Chris said we are hiring you to do circulation or fulfillment or both and I replied it depends on what exactly you need."

**ANSWER:**    HDS denies McNally tried to persuade MSCI to give HDS its fulfillment

work but is without knowledge or information sufficient to form a belief as to the remaining

allegations in paragraph 20 and, accordingly, they are denied.

21.    In a July 11, 2007 email, McNally stated that he had received a lead from Giles for some circulation management work for "newsstand guy" and that McNally had contacted this prospect to discuss McNally handling his circulation management work.

**ANSWER:**    HDS is without knowledge or information sufficient to form a belief as to

the allegations in paragraph 21 and, accordingly, they are denied.

22.    In an exchange of emails between Giles and McNally on August 13, 2007, McNally advises Giles of a potential business opportunity and again expresses his ill will towards PMG: "And you wonder why I hate everybody that had ever been connected with this fucking place."  Giles replied by lauding McNally's efforts and stated: "you may have a business of your own if <u>we</u> keep this up." (underlining added).  Indeed, with the assistance and encouragement of Hallmark and while still employed by PMG, McNally had long since begun a "business of his own" by diverting circulation management work to his own use and fulfillment work to Hallmark.

**ANSWER:**    HDS denies that McNally diverted (improperly or otherwise) fulfillment work to HDS but is without knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 22 and, accordingly, they are denied.

23.    Also on August 13, 2007, McNally responded to a request by Giles that McNally send him one of PMG's written proposals that fit certain criteria defined by Giles. McNally in fact sent one of PMG's written proposals to Giles. Among other things, that proposal contained PMG's pricing. McNally told Giles that this PMG proposal was "the closest to what you were looking for, for purposes of comparison, Multi titles, not 140k but in the neighborhood." Upon information and belief, McNally and Hallmark used this PMG proposal to prepare a successful proposal to one of PMG's biggest clients, Hendon Publishing Company.

**ANSWER:**    HDS is without knowledge or information sufficient to form a belief as to the allegations in paragraph 24 and, accordingly, they are denied.

24.    On September 3, 2007, McNally submitted a proposal to Linux Journal in an effort to obtain circulation management work for himself and fulfillment work for Hallmark.

**ANSWER:**    HDS denies McNally submitted a proposal to Linux Journal on behalf of HDS but is without knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 24 and, accordingly, they are denied.

25.    In September 7, 2007 email, Dan Johnson-Weinberger of Permanent Campaigns Consulting emailed McNally stating that he had been referred to McNally as a potential vendor for circulation management services for a magazine called More Riders Magazine. McNally replied to that email on September 11, 2007, stating that his rate for circulation management services was $100 per hour and that "if we were to do fulfillment as well it would be based on both the size of the file and an estimate of the hours spent." McNally's reference to "we" was a reference to McNally and Hallmark.

**ANSWER:**    HDS denies that the reference to "we" is to HDS but it is without knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 25 and, accordingly, they are denied.

26.    In the Summer and Fall of 2007, McNally and Hallmark solicited a publisher of various magazines, Key Communications, for McNally to provide circulation management services and Hallmark to provide fulfillment services. McNally and Hallmark later submitted a written proposal and sample budget to provide those services to Key Communications. On or about September 5, 2007, McNally traveled to Virginia and met with representatives of Key

Communications.  On September 10, 2007, McNally and Hallmark submitted another written proposal to Key Communications to provide these services.  A representative of Key Communications asked McNally to confirm that he was able to "subcontract the fulfillment work," and McNally confirmed that he could do that and could personally coordinate the fulfillment services.  Upon information and belief, McNally is providing or has provided circulation management services to Key Communications and Hallmark has provided and is providing fulfillment services to Key Communications.

     **ANSWER:**     HDS admits that it submitted a written proposal to Key Communications

but denies having provided fulfillment services to Key Communications.  HDS is without

knowledge or information sufficient to form a belief as to the allegations in paragraph 26 and,

accordingly, they are denied.

     27.     In an email dated December 5, 2007, Gail Weaverling of Stackpole Magazines told McNally that she had been referred to McNally as a possible vendor of fulfillment services.  Upon information and belief, McNally offered this fulfillment opportunity to Hallmark, but Hallmark was not interested in it.  McNally asked Giles in an email if there was any reason McNally should give this opportunity to PMG.  Giles stated that it was "probably" a better idea to refer the opportunity to a company called ESP Computer Services Inc. ("ESP") in order to "curry favor" with ESP.  McNally in fact referred that opportunity to ESP and in an email to Stefan Beeli of ESP, McNally stated that he was referring this work to Beeli "discreetly."  Beeli replied that he would keep the diverted opportunity "in confidence."

     **ANSWER:**     HDS denies that McNally offered HDS the fulfillment opportunity but

admits Giles recommended ESP as a possible vendor.  HDS is without knowledge or information

sufficient to form a belief as to the remaining allegations in paragraph 27 and, accordingly, they

are denied.

     28.     On December 5, 2007, McNally signed a contract with ALM Business Media ("ALM"), publisher of On-the-Go FoodService's print publication, to provide it with circulation management services.  In a December 12, 2007 email, Giles of Hallmark told Tricia Speer of Hallmark, that Hallmark would have a signed contract with ALM the following day and that McNally would be doing the circulation management work for ALM.

     **ANSWER:**     HDS admits that Giles told McNally in an e-mail dated December 12,

2007 that ALM Business Media, publisher of On-the-Go FoodService's print publication, signed

a contract  but is without knowledge or information sufficient to form a belief as to the remaining

allegations in paragraph 28 and, accordingly, they are denied.

29.     In the same December 5, 2007 email referenced above, in response to McNally's question to Giles regarding whether Hallmark had signed the contracts with Key Communications and On-the-Go FoodService, Giles told McNally: "Key – no. Let's discuss.  I thought I was going to negotiate that with you, Maureen – Final contract was sent out today."

**ANSWER:**     HDS is without knowledge or information sufficient to form a belief as to

the allegations in paragraph 29 and, accordingly, they are denied.

30.     Also in November and December of 2007, as alluded to above, McNally and Hallmark induced one of PMG's biggest clients, Hendon Publishing Company, to move its circulation management work from PMG to McNally and to move its fulfillment work from PMG to Hallmark.

**ANSWER:**     HDS denies the allegations set forth in paragraph 30.

31.     In December 12, 2007 email, Giles tacitly acknowledged the impropriety of the conspiracy between McNally and Hallmark, asking McNally: "Why do you keep using this e-mail account?"

**ANSWER:**     HDS denies the allegations set forth in paragraph 31.

32.     PMG was capable of performing the circulation management and fulfillment work with respect to each of the corporate opportunities described above, as those are precisely the services PMG is in the business of providing.  However, McNally did not present any of those opportunities to PMG or disclose their existence to PMG.  McNally further failed to disclose that he was personally performing circulation management work, referring fulfillment work to Hallmark, or that he had entered into an agreement with Hallmark pursuant to which Hallmark would refer circulation management work to McNally personally in exchange for McNally diverting fulfillment work to Hallmark.

**ANSWER:**     HDS denies the allegations set forth in paragraph 32.

33.     McNally and Hallmark proximately caused PMG to sustain damages, including but not limited to, lost profits from the diverted business opportunities, lost profits from the loss of existing business, and the payment of over $150,000 in salary to McNally for a period of time during which he was unfairly and wrongfully competing with PMG.

**ANSWER:**     HDS denies the allegations set forth in paragraph 33.

34.     McNally and Hallmark's retention of the profits derived from the scheme described above violated the fundamental principals of equity and good conscience.

**ANSWER:**     HDS denies the allegations set forth in paragraph 34.

35.     The acts of McNally and Hallmark were intentional, unjustified, willful, wanton, and in reckless disregard for the rights of PMG.

**ANSWER:**     HDS denies the allegations set forth in paragraph 35.

**Count I**
**Breach of Fiduciary Duty**
(Against McNally)

36.     PMG realleges paragraphs 1 through 35 above as though fully set forth herein.

**ANSWER:**     The allegations set forth in Count I are not asserted against HDS.  As such, no response by HDS is required.

37.     As an employee and agent of PMG, McNally owed PMG certain fiduciary duties, including a duty of loyalty during his employment.

**ANSWER:**     The allegations set forth in Count I are not asserted against HDS.  As such, no response by HDS is required.

38.     An agent is required to act solely for the principal in all matters related to the agency and to refrain from competing with the principal.

**ANSWER:**     The allegations set forth in Count I are not asserted against HDS.  As such, no response by HDS is required.

39.     McNally breached the duties he owed to PMG by engaging in the acts, agreements, and scheme described above, including, but not limited to: diverting corporate opportunities to himself; diverting corporate opportunities to Hallmark; diverting corporate opportunities to other third parties; soliciting and inducing one of PMG's biggest clients to move its work to McNally and Hallmark; entering into an agreement with Hallmark by which McNally provided fulfillment work to Hallmark in exchange for Hallmark providing circulation management work to McNally; using and disclosing PMG's proprietary proposal and pricing information; using and disclosing to Hallmark PMG's client information; using other PMG resources including its email server to compete with PMG; disparaging PMG to third parties, accepting salary and health benefits from PMG while failing to make efforts to advance its interests and instead working contrary to its interests; failing to disclose the business

relationships he had developed and the monies he was receiving from clients and Hallmark; misleading PMG; and conspiring against PMG and failing to disclose that conspiracy.

**ANSWER:**    The allegations set forth in Count I are not asserted against HDS.  As such,

no response by HDS is required.

40.    As a direct and proximate cause of McNally's breaches, PMG sustained damages, including, but not limited to, lost profits from the diverted business opportunities, the payment of over $150,000 in salary to McNally during the time he was breaching his duties, and damage to it reputation and good will.

**ANSWER:**    The allegations set forth in Count I are not asserted against HDS.  As such,

no response by HDS is required.

### Count II
### Usurping Business Opportunities
(Against McNally)

41.    PMG realleges paragraphs 1 through 35 above as this Paragraph 41 as though fully set forth herein.

**ANSWER:**    The allegations set forth in Count II are not asserted against HDS.  As

such, no response by HDS is required.

42.    As an employee and agent of PMG, McNally owed PMG certain fiduciary duties, including a duty of loyalty during his employment.

**ANSWER:**    The allegations set forth in Count II are not asserted against HDS.  As

such, no response by HDS is required.

43.    McNally obtained and was presented with business opportunities for circulation management and fulfillment work.  Those opportunities were reasonably incident to the then present or prospective business of PMG and were opportunities in which the corporation had the capacity to engage.  Indeed, at the time the opportunities arose continuing through the present, PMG was engaged in the business of providing the exact services sought by the individuals and organizations presenting the opportunities.

**ANSWER:**    The allegations set forth in Count II are not asserted against HDS.  As

such, no response by HDS is required.

44.     PMG was never given an opportunity to decide whether to pursue or accept any of these opportunities because McNally never disclosed them to PMG and in fact concealed them from PMG.

**ANSWER:**     The allegations set forth in Count II are not asserted against HDS.  As such, no response by HDS is required.

45.     As a direct and proximate result of McNally's diversion of these opportunities, PMG has sustained damages, including the lost profits associated with the diverted opportunities.

**ANSWER:**     The allegations set forth in Count II are not asserted against HDS.  As such, no response by HDS is required.

### Count III
### Constructive Fraud
(Against McNally)

46.     PMG realleges paragraphs 1 through 35 above as this paragraph 46  adopts and 46 as though fully set forth herein.

**ANSWER:**     The allegations set forth in Count III are not asserted against HDS.  As such, no response by HDS is required.

47.     As an employee and agent of PMG, McNally owed PMG certain fiduciary duties, including a duty of loyalty during his employment.

**ANSWER:**     The allegations set forth in Count III are not asserted against HDS.  As such, no response by HDS is required.

48.     An agent is required to act solely for the principal in all matters related to the agency and to refrain from competing with the principal.

**ANSWER:**     The allegations set forth in Count III are not asserted against HDS.  As such, no response by HDS is required.

49.     McNally breached the duties he owed to PMG by engaging in the acts, agreements, and scheme described above, including, but not limited to: diverting corporate opportunities to himself; diverting corporate opportunities to Hallmark; diverting corporate opportunities to other third parties; soliciting and inducing one of PMG's biggest clients to move

its work to McNally and Hallmark; entering into an agreement with Hallmark by which McNally provided fulfillment work to Hallmark in exchange for Hallmark providing circulation management work to McNally; using and disclosing PMG's proprietary proposal and pricing information; using and disclosing to Hallmark PMG's client information; using other PMG resources including its email server to compete with PMG; disparaging PMG to third parties, accepting salary and health benefits from PMG while failing to make efforts to advance its interests and instead working contrary to its interests; failing to disclose the business relationships he had developed and the monies he was receiving from clients and Hallmark; misleading PMG; and conspiring against PMG and failing to disclose that conspiracy.

**ANSWER:**    The allegations set forth in Count III are not asserted against HDS.  As

such, no response by HDS is required.

50.    McNally profited from the breaches of his fiduciary duties described above through his receipt of monies obtained from the diverted business opportunities, including the amounts paid to him for circulation management work; his receipt of compensation from PMG, and any monies paid to him by Hallmark and/or Giles.

**ANSWER:**    The allegations set forth in Count III are not asserted against HDS.  As

such, no response by HDS is required.

51.    As a direct and proximate cause of McNally's breaches, PMG sustained damages, including, but not limited to, lost profits from the diverted business opportunities, the payment of over $150,000 in salary to McNally during the time he was breaching his duties, and damage to it reputation and good will.

**ANSWER:**    The allegations set forth in Count III are not asserted against HDS.  As

such, no response by HDS is required.

**Count IV**
**Unjust Enrichment**
(Against McNally)

52.    PMG realleges paragraphs 1 through 35 above as this Paragraph 52 as though fully set forth herein.

**ANSWER:**    The allegations set forth in Count IV are not asserted against HDS.  As

such, no response by HDS is required.

53.    Through and as a result of the wrongful conduct described above, McNally has received monies from third parties in connection with circulation management work.

**ANSWER:**     The allegations set forth in Count IV are not asserted against HDS.  As such, no response by HDS is required.

54.     McNally's receipt of these monies was to PMG's detriment.

**ANSWER:**     The allegations set forth in Count IV are not asserted against HDS.  As such, no response by HDS is required.

55.     In addition, McNally has been unjustly enriched as a result of his receipt and retention of the salary and benefits paid to him by PMG during the time he was engaged in the wrongful conduct described above.

**ANSWER:**     The allegations set forth in Count IV are not asserted against HDS.  As such, no response by HDS is required.

56.     McNally's retention of the aforesaid benefits violates the fundamental principles of justice, equity, and good conscience.

**ANSWER:**     The allegations set forth in Count IV are not asserted against HDS.  As such, no response by HDS is required.

## Count V
## <u>Inducing Breach of Fiduciary Duty</u>
(Against Hallmark)

57.     PMG realleges paragraphs 1 through 35 above as this paragraph 57 as though fully set forth herein.

**ANSWER:**     HDS asserts its responses to paragraphs 1 through 35 of Plaintiff's Answer as this paragraph 57 as if fully set forth herein.

58.     As an employee and agent of PMG, McNally owed PMG certain fiduciary duties, including a duty of loyalty during his employment.

**ANSWER:**     The allegations set forth in paragraph 57 contain legal conclusions to which no response is required.  To the extent a response is required, HDS denies the allegations set forth in paragraph 57.

59.     An agent is required to act solely for this principal in all matters related to the agency and to refrain from competing with the principal.

**ANSWER:**     The allegations set forth in paragraph 58 contain legal conclusions to

which no response is required.  To the extent a response is required, HDS denies the allegations

set forth in paragraph 58.

60.     McNally breached the duties he owed to PMG by engaging in the acts, agreements, and scheme described above, including, but not limited to: diverting corporate opportunities to himself; diverting corporate opportunities to Hallmark; diverting corporate opportunities to other third parties; soliciting and inducing one of PMG's biggest clients to move its work to McNally and Hallmark; entering into an agreement with Hallmark by which McNally provided fulfillment work to Hallmark in exchange for Hallmark providing circulation management work to McNally; using and disclosing PMG's proprietary proposal and pricing information; using and disclosing to Hallmark PMG's client information; using other PMG resources including its email server to compete with PMG; disparaging PMG to third parties, accepting salary and health benefits from PMG while failing to make efforts to advance its interests and instead working contrary to its interests; failing to disclose the business relationships he had developed and the monies he was receiving from clients and Hallmark; misleading PMG; and conspiring against PMG and failing to disclose that conspiracy.

**ANSWER:**     The allegations set forth in paragraph 59 contain legal conclusions to

which no response is required.  To the extent a response is required, HDS denies the allegations

set forth in paragraph 59.

61.     Hallmark, through its employee and agent Giles and other employees and/or agents presently unknown to PMG, knowingly participated in and induced McNally's breaches of his fiduciary duties to PMG and accepted benefits of those breaches, including the profits derived from the diverted fulfillment work.

**ANSWER:**     The allegations set forth in paragraph 61 contain legal conclusions to

which no response is required.  To the extent a response is required, HDS denies the allegations

set forth in paragraph 61.

62.     As a direct and proximate cause of the wrongful acts of Hallmark and McNally, PMG sustained damages, including, but not limited to, lost profits from the diverted business circulation management work, lost profits from the diverted fulfillment work, the payment of over $150,000 in salary to McNally during the time he was breaching his duties, and damages to its reputation and good will.

**ANSWER:**     The allegations set forth in paragraph 62 contain legal conclusions to which no response is required.  To the extent a response is required, HDS denies the allegations set forth in paragraph 62.

HDS denies each and every allegation set forth in the "WHEREFORE" paragraph of Count V of Plaintiff's Complaint.

**Count VI**
**Aiding and Abetting Breach of Fiduciary Duty**
(Against Hallmark)

63.     PMG realleges paragraphs 1 through 35 above as this paragraph 63 as though fully set forth herein.

**ANSWER:**     HDS asserts its responses to paragraphs 1 through 35 of Plaintiff's Answer as this paragraph 63 as if fully set forth herein.

64.     As an employee and agent of PMG, McNally owed PMG certain fiduciary duties, including a duty of loyalty during his employment.

**ANSWER:**     The allegations set forth in paragraph 64 contain legal conclusions to which no response is required.  To the extent a response is required, HDS denies the allegations set forth in paragraph 64.

65.     An agent is required to act solely for the principal in all matters related to the agency and to refrain from competing with the principal.

**ANSWER:**     The allegations set forth in paragraph 65 contain legal conclusions to which no response is required.  To the extent a response is required, HDS denies the allegations set forth in paragraph 65.

66.     McNally breached the duties he owed to PMG by engaging in the acts, agreements, and scheme described above, including, but not limited to: diverting corporate opportunities to himself; diverting corporate opportunities to Hallmark; diverting corporate opportunities to other third parties; soliciting and inducing one of PMG's biggest clients to move its work to McNally and Hallmark; entering into an agreement with Hallmark by which McNally provided fulfillment work to Hallmark in exchange for Hallmark providing circulation management work to McNally; using and disclosing PMG's proprietary proposal and pricing

information; using and disclosing to Hallmark PMG's client information; using other PMG resources including its email server to compete with PMG; disparaging PMG to third parties, accepting salary and health benefits from PMG while failing to make efforts to advance its interests and instead working contrary to its interests; failing to disclose the business relationships he had developed and the monies he was receiving from clients and Hallmark; misleading PMG; and conspiring against PMG and failing to disclose that conspiracy.

     **ANSWER:**   The allegations set forth in paragraph 66 contain legal conclusions to which no response is required.  To the extent a response is required, HDS denies the allegations set forth in paragraph 66.

     67.    Hallmark, through its employee and agent Giles and other employees and/or agents presently unknown to PMG, aided McNally in his wrongful acts as described above; was aware of its role in the overall tortious activity at the time it provided that assistance; and knowingly and substantially assisted McNally in these wrongful acts.

     **ANSWER:**   The allegations set forth in paragraph 67 contain legal conclusions to which no response is required.  To the extent a response is required, HDS denies the allegations set forth in paragraph 67.

     68.    As a direct and proximate cause of the wrongful acts of Hallmark and McNally, PMG sustained damages, including, but not limited to, lost profits from the diverted business circulation management work, lost profits from the diverted fulfillment work, the payment of over $150,000 in salary to McNally during the time he was breaching his duties, and damage to its reputation and good will.

     **ANSWER:**   The allegations set forth in paragraph 68 contain legal conclusions to which no response is required.  To the extent a response is required, HDS denies the allegations set forth in paragraph 68.

     HDS denies each and every allegation set forth in the "WHEREFORE" paragraph of Count VI of Plaintiff's Complaint.

**Count VII**
**Civil Conspiracy**
(Against Hallmark)

     69.    PMG realleges paragraphs 1 through 35 above as this paragraph 69 as though fully set forth herein.

**ANSWER:**    HDS asserts its responses to paragraphs 1 through 35 of Plaintiff's Answer as this paragraph 69 as if fully set forth herein.

70.    While McNally was employed by PMG, Hallmark and McNally combined for the purpose of diverting to themselves business opportunities belonging to PMG.

**ANSWER:**    The allegations set forth in paragraph 62 contain legal conclusions to which no response is required.  To the extent a response is required, HDS denies the allegations set forth in paragraph 70.

71.    In furtherance of their unlawful purposes and means, Hallmark committed the overt tortious and/or unlawful acts described above.

**ANSWER:**    The allegations set forth in paragraph 71 contain legal conclusions to which no response is required.  To the extent a response is required, HDS denies the allegations set forth in paragraph 71.

72.    Hallmark knowingly and voluntarily participated in the common scheme and tortious acts described above.

**ANSWER:**    The allegations set forth in paragraph 71 contain legal conclusions to which no response is required.  To the extent a response is required, HDS denies the allegations set forth in paragraph 72.

73.    As a direct and proximate cause of the wrongful acts of Hallmark and McNally, PMG sustained damages, including, but not limited to, lost profits from the diverted business circulation management work, lost profits from the diverted fulfillment work, the payment of over $150,000 in salary to McNally during the time he was breaching his duties, and damage to its reputation and good will.

**ANSWER:**    The allegations set forth in paragraph 73 contain legal conclusions to which no response is required.  To the extent a response is required, HDS denies the allegations set forth in paragraph 73.

HDS denies each and every allegation set forth in the "WHEREFORE" paragraph of Count VII of Plaintiff's Complaint.

## Count VIII
## Unjust Enrichment
(Against Hallmark)

74.     PMG realleges paragraphs 1 through 35 above as this paragraph 74 as though fully set forth herein.

**ANSWER:**   HDS asserts its responses to paragraphs 1 through 35 of Plaintiff's Answer as this paragraph 74 as if fully set forth herein.

75.     As a result of the diversion of business opportunities belonging to PMG, Hallmark has received monies from third parties for fulfillment work.

**ANSWER:**   The allegations set forth in paragraph 75 contain legal conclusions to which no response is required.  To the extent a response is required, HDS denies the allegations set forth in paragraph 75.

76.     Hallmark received those monies as a result of its wrongful conduct and that of its co-conspirator, McNally.

**ANSWER:**   The allegations set forth in paragraph 76 contain legal conclusions to which no response is required.  To the extent a response is required, HDS denies the allegations set forth in paragraph 76.

77.     Hallmark's receipt of those monies was to PMG's detriment.

**ANSWER:**   The allegations set forth in paragraph 77 contain legal conclusions to which no response is required.  To the extent a response is required, HDS denies the allegations set forth in paragraph 77.

78.     Hallmark has been unjustly enriched through its receipt of those monies.

**ANSWER:**    The allegations set forth in paragraph 78 contain legal conclusions to which no response is required.  To the extent a response is required, HDS denies the allegations set forth in paragraph 78.

79.    Hallmark's retention of those monies violates the fundamental principles of justice, equity, and good conscience.

**ANSWER:**    The allegations set forth in paragraph 79 contain legal conclusions to which no response is required.  To the extent a response is required, HDS denies the allegations set forth in paragraph 79.

HDS denies each and every allegation set forth in the "WHEREFORE" paragraph of Count VIII of Plaintiff's Complaint.

### Count IX
### Vicarious Liability
(Against Hallmark)

80.    PMG realleges paragraphs 1 through 35 above as this paragraph 80 as though fully set forth herein.

**ANSWER:**    HDS asserts its responses to paragraphs 1 through 35 of Plaintiff's Answer as this paragraph 80 as if fully set forth herein.

81.    McNally was an agent of Hallmark.

**ANSWER:**    The allegations set forth in paragraph 81 contain legal conclusions to which no response is required.  To the extent a response is required, HDS denies the allegations set forth in paragraph 81.

82.    The scope of McNally's agency for Hallmark included McNally diverting business opportunities for fulfillment work from PMG to Hallmark, in exchange for McNally performing the circulation management work associated with that fulfillment work.

**ANSWER:**    The allegations set forth in paragraph 82 contain legal conclusions to which no response is required.  To the extent a response is required, HDS denies the allegations set forth in paragraph 82.

83.    PMG sustained damages as a result of McNally's wrongful acts, including lost profits on diverted business and the compensation paid to McNally during the time he was breaching the duties he owed to PMG.

**ANSWER:**    The allegations set forth in paragraph 83 contain legal conclusions to which no response is required.  To the extent a response is required, HDS denies the allegations set forth in paragraph 83.

84.    The wrongful acts of McNally described above were undertaken pursuant to the direction of Hallmark. Further, Giles of Hallmark provided McNally with detailed instructions regarding the companies and persons McNally should approach, the manner in which McNally should approach them, and the terms of the proposals McNally made to those companies and persons on behalf of himself and Hallmark.

**ANSWER:**    The allegations set forth in paragraph 84 contain legal conclusions to which no response is required.  To the extent a response is required, HDS denies the allegations set forth in paragraph 84.

HDS denies each and every allegation set forth in the "WHEREFORE" paragraph of Count IX of Plaintiff's Complaint.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

To the extent Plaintiff has failed to state claims or put forth a cause of action upon which relief can be granted, such claims must be dismissed.

## **Second Affirmative Defense**

The Complaint should be dismissed, in whole or in part, pursuant to the doctrine of estoppel, waiver, and/or laches where applicable, including but not limited to, that Plaintiff's own actions bar this action and/or otherwise prohibit recovery in this action.

## **Reservation Of Rights**

Defendant reserves the right to amend its Answer or add affirmative defenses that may become known after the filing of this Answer.

WHEREFORE, Defendant Hallmark Data Systems, LLC seeks entry of judgment in its favor and against Plaintiff on all Counts brought against Hallmark Data Systems, LLC in the Complaint, an award of its costs and fees and such other relief as this Court deems appropriate.

Respectfully submitted,

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART

/s/ R. Lance Witcher
R. Lance Witcher, #89938
7700 Bonhomme Avenue, Suite 650
St. Louis, Missouri 63105
(314) 802-3935
(314) 802-3936 (FAX)
Lance.witcher@ogletreedeakins.com

Jennifer L. Colvin, 6274731
20 South Clark Street, 25th Floor
Chicago, IL 60603
(312) 558-1220
(312) 807-3619 (FAX)
Jennifer.colvin@ogletreedeakins.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on the 5th day of May, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

Adam L. Saper                                      Jeffrey D. Hupert
Hinshaw & Culbertson LLP                 Riordan, Fulkerson, Hupert & Coleman
222 N. LaSalle Street, Suite 300         30 North LaSalle Street, Suite 2630
Chicago, IL 60601                               Chicago, Illinois 60602


   s/ R. Lance Witcher       
ATTORNEY FOR DEFENDANT HALLMARK
DATA SYSTEMS, LLC


6268710.1 (OGLETREE)